UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                                                          PLAINTIFF

v.

GOODRICH CORPORATION                                                                        DEFENDANT;
                                                                                                        THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                                                                          DEFENDANT;
                                                                                                        THIRD PARTY PLAINTIFF

**MEMORANDUM OPINION**

This matter is before the Court on Westlake Vinyls, Inc.'s ("Westlake") Motion for Partial Summary Judgment dismissing Goodrich Corporation's ("Goodrich") Counterclaim against Westlake to the extent it seeks damages with respect to "No. 4 Shore Tank" located at Westlake's chemical plant in Calvert City, Kentucky (the "Site") (Docket #459). Goodrich filed a response (Docket #505), to which Westlake has replied (Docket #532). This matter is now ripe for adjudication. For the reasons that follow, Westlake's Motion for Partial Summary Judgment is DENIED.

**BACKGROUND**

From 1953 through 2000, Goodrich operated several chemical manufacturing units at the Site. Goodrich built No. 4 Shore Tank in 1967 to store ethylene-dichloride ("EDC"). No. 4 Shore Tank was built on a concrete ring foundation, the interior of which consisted of a bed of sand on top of soil. During Goodrich's operation of No. 4 Shore Tank, the tank experienced three incidents of

leakage from its wall, all of which were contained.

Goodrich remains obligated by federal and state law to pump and treat contaminated groundwater flowing under the Site each month pursuant to its Part B Permit ("Permit") issued under KRS Chapter 224.46 and the Resource Conservation and Recovery Act of 1976 ("RCRA"). As the sole "permittee," Goodrich must comply or ensure compliance with all terms of the Permit. These terms include the installation and maintenance of a groundwater monitoring system and implementation of a corrective action program to contain and remediate hazardous constituents known to exist in the groundwater. This program is known as the Plantwide Corrective Action Program, or "PCAP."

In March of 1990, Goodrich and Westlake entered into an Amended and Restated Master Conveyance Agreement ("1990 Agreement") for the sale to Westlake by Goodrich of its EDC and vinyl chloride monomer manufacturing units at the Site ("EDC/VCM Plant"). No. 4 Shore Tank was included in the sale of the EDC/VCM Plant to Westlake.

Article 1.4(d) of the 1990 Agreement provides that Westlake "shall not assume any liability or obligation . . . of Goodrich, and Goodrich . . . shall retain all liabilities and obligations . . . with respect to or arising out of the EDC or VCM business conducted by Goodrich at the Calvert City complex, or the ownership, possession or use of the Assets . . . prior to the Closing, unless expressly provided otherwise herein." Article 8 of the 1990 Agreement also contained indemnity provisions for both parties. Goodrich agreed to indemnify Westlake for all losses and costs related to "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring or any condition existing prior to the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant prior to the Closing Date." Westlake

provided a reciprocal indemnity to Goodrich for "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date."

In 1992 Westlake permanently removed No. 4 Shore Tank from service and decommissioned it, having operated the tank for a period of approximately fifteen months. When the tank was removed from service, Westlake found three holes in the bottom of the tank. Subsequent sampling of the soil underneath the tank revealed that EDC contamination was present. On April 29, 1993, Westlake informed Goodrich that it had found contamination under the tank. The parties disagree as to when the contamination occurred.

On July 27, 1993, Goodrich contacted the Environmental Protection Agency ("EPA"), concerning the contamination. The letter stated in part:

> Since that initial notification [by Westlake to the Cabinet of the contamination at No. 4 Shore Tank] BFGoodrich reviewed it's [sic] records and found three release incidents associated with No. 4 EDC tank. All releases were spills or side wall leaks onto the concrete pad around the tank and contained. Also, Westlake responded to our request for additional information that they may have on releases form [sic] the No. 4 EDC tank area. . .
>
> It is BFGoodrich's belief that the soil contamination detected by Westlake after removing [] some of the tank foundation sand, soil samples "C" enclosed, is indicative of the tank bottom leak discovered by Westlake. Once Westlake has cleaned up the surface and near surface soils in conformance with Kentucky Requirements the site will be remediated.
>
> Because the site is located within the cone of depression of the groundwater corrective action wells any possible releases to the aquifer will be contained and remediated.

In a September 24, 1993, letter from Goodrich to Westlake, Goodrich indicated that the surface soil contamination at No. 4 Shore Tank fit Goodrich's site wide remediation plan. This plan,

prepared in conjunction with Goodrich's RCRA Permit, utilized "the existing aquifer pump and treat system to remediate subsurface soil and groundwater under the plant site." In the letter Goodrich states:

> Goodrich is proposing that the soil above the frost line is the only soil subject to causal disturbance and as such is a reasonable limit to the surface soil exposure pathway. Soils deeper than the frost line would only be disturbed as a planned activity. Therefore, if surface soil is removed to a depth of eighteen (18) inches and back filled with clean clay soil, the surface soil risk pathway is blocked and natural processes will remediate that subsurface soil.
>
> Based on the information provided by Westlake if an additional 18" was removed from sections 1, 2, 3 & 4 of the No. 4 EDC shore tank foundation area (July 22, 1993 sampling) and the area backed filled with clay soil Goodrich would include this area in its site wide remediation approach.
>
> I believe that a site wide approach is quite appropriate for a multiple use and owner site such as our [sic]. Should you like more information on our surface soil remediation approach please give me a call.

Subsequently Westlake removed an additional eighteen inches of soil from beneath No. 4 Shore Tank and back-filled the area.

Goodrich asserts that it notified Westlake in July of 2003 that Goodrich would seek remediation costs from Westlake from the EDC contamination.[1]

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.

---

[1] Westlake asserts that Goodrich did not attempt to recover remediation costs until 2007.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

"Waiver is the knowing and intentional relinquishment or abandonment of a known right." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 481 F.3d 337, 352 (6th Cir. 2007). There can be no effective waiver where a party either does not know its rights or fails to fully understand those rights. *Id.*

Westlake argues that Goodrich's actions with respect to No. 4 Shore Tank warrant a finding

of waiver as a matter of law. Westlake characterizes Goodrich's letter of September 24, 1993, as a resolution of the issue of which company was responsible for the remediation of the contamination caused by the tank. Westlake asserts that it accepted this offer and relied upon it to its detriment by removing the surface soil to a depth of eighteen inches and back-filling the area with clay soil. Westlake argues that Goodrich waived any claim against Westlake with respect to the tank because Westlake remediated the soil beneath the tank in the manner proposed by Goodrich, and Goodrich did not give notice that it did not accept Westlake's remediation of the area until at least 2003.

This Court, resolving all ambiguities and drawing all reasonable inferences against Westlake, cannot find that Goodrich's letter of September 24, 1993, constituted a proposal to release Westlake from its indemnification liability under Article 8 of the 1990 Agreement. Although the letter states that if Westlake removed the eighteen inches of soil and then back-filled the area, which it subsequently did, Goodrich would include the area in its site wide remediation approach, there is no statement that inclusion within the site wide remediation approach would absolve Westlake of indemnification liability nor, for purposes of this motion, can the Court find that this was the intent of the parties. *See Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 105-06 (Ky. 2003) (stating that in absence of an ambiguity a written instrument will be enforced strictly according to its terms and if an ambiguity exists, the court will gather, if possible, the intent of the parties from the contract as a whole). The letter addresses the type of approach that will be used to remediate the contamination, not the allocation of the costs of remediation.

## CONCLUSION

For the foregoing reasons, Westlake's Motion for Partial Summary Judgment is DENIED. An appropriate order shall issue.