UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                          PLAINTIFF

v.

GOODRICH CORPORATION                              DEFENDANT;
                                        THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                    THIRD PARTY DEFENDANT


**MEMORANDUM OPINION**

This matter is before the Court on Goodrich Corporation's Motion for Partial Summary

Judgment on its Declaratory Claims (Counts I and II) against PolyOne Corporation (Docket #456).

PolyOne filed a response (Docket #497) to which Goodrich has replied (Docket #525).  This matter

is now ripe for adjudication.  For the reasons that follow, Goodrich's Motion for Partial Summary

Judgment on its Declaratory Claims is GRANTED.

**BACKGROUND**

During the 1950s, an industrial park was developed on the southern bank of the Tennessee

River near Calvert City, Kentucky.  Goodrich purchased approximately 150 acres of that park in

1951 for use as a manufacturing facility ("the Site").  Goodrich produced vinyl chloride monomer

("VCM") at the Site  from 1953 to March 1, 1990.  Goodrich began to use ethylene dichloride

("EDC"), a feedstock used to produce VCM, to make VCM in 1959 and in 1964 it added a new plant

to convert EDC to VCM.  The units that made EDC and the units that "cracked" EDC to form VCM

were known collectively as the EDC/VCM Plant.  Goodrich also built and operated facilities at the

Site that manufactured ethylene and chlorine, the feedstock for EDC, and a byproduct called caustic. This part of the Site was known as the Chlor-Alkali and Olefins Plant ("CA&O Plant").

Waste containing EDC was generated at the Site. Treatment included settlement ponds, landfills, and burn pits. Over a period of time, some of the EDC contained in this waste migrated through the soil to the groundwater underlying the Site.

In June of 1988, the Environmental Protection Agency ("EPA") issued a Record of Decision ("ROD") declaring a portion of the Site, specifically a landfill on the Site's eastern boundary, a "Superfund Site" subject to remediation requirements under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Goodrich was required to secure approval of, implement, complete, and pay for remedial actions approved by the EPA and to provide reimbursement for future oversight costs.

The Kentucky Natural Resources and Environmental Protection Cabinet (the "Cabinet") issued a Hazardous Waste Management Permit to Goodrich effective October 29, 1989. The EPA issued a similar permit under the Hazardous Solid Waste Management Act Amendments ("HSWA") Post-Closure Permit, also effective October 29, 1989. Together the Kentucky and EPA permits form the Resource Conservation and Recovery Act ("RCRA") Part B Permit for the Site.[1]

As the sole permittee, Goodrich must comply or ensure compliance with all terms and conditions of the Permit. These legal obligations include:

---

[1] RCRA mandates that "each person owning or operating an existing facility . . . for the treatment, storage, or disposal of hazardous waste . . . have a permit." 42 U.S.C. § 6925(a).

The two permits that collectively constituted the RCRA Part B Permit were replaced by one Hazardous Waste Management Permit effective October 30, 2003. Portions pertinent to the instant matter are essentially the same as corresponding portions of the Permit issued in 1989. These permits are collectively referred to as the "Permit."

To install and maintain a groundwater monitoring system.

To treat all contaminated groundwater under the Site and to treat all contaminated groundwater migrating outside the Site's boundaries to underlying contiguous properties.

To develop and implement a corrective action program to clean up the groundwater to a concentration standard established by law and regulation. The program is known as the Plant-wide Corrective Action Program ("PCAP"). Goodrich's C-Stripper and extraction well system was approved by the regulators as the mandated corrective measure under the PCAP.

To ensure the PCAP complies with the groundwater protection standard.

To both operate and adequately fund the PCAP, specifically including the C-Stripper.

To clean up the groundwater until a demonstration is made that concentrations of targeted contaminants fall below the groundwater protection standard.

Non-compliance with any Permit condition would subject Goodrich to an enforcement action.

On March 1, 1990, pursuant to the Amended and Restated Master Conveyance Agreement ("1990 Agreement"), Goodrich sold the EDC/VCM Plant to Westlake Vinyls, Inc. In Section 8.3 of the 1990 Agreement, Westlake agreed to "indemnify and save Goodrich harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date." Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2.

As part of the 1990 Agreement to sell the EDC/VCM Plant, Westlake and Goodrich met with state and federal environmental regulators before the closing to discuss the status of the Permit. Goodrich advocated to the regulators that Westlake not be added to the Permit. Ultimately, the state did not require Westlake to become liable under the Part B Permit; provisions allowing Goodrich

3

access to Westlake's property to conduct its remediation obligations under the Permit were deemed satisfactory.

On February 11, 1993, Goodrich began to divest itself of its PVC business, incorporating a new, wholly-owned subsidiary, Geon. Effective March 1, 1993, Goodrich transferred substantially all of the liabilities and assets of its PVC business that had been operated by the Geon Vinyls Division to newly-formed Geon. Goodrich sold all of its shares in a two-stage public offering that took place in May and November of 1993.

Goodrich originally intended to transfer all of its PVC-related assets at Calvert City to Geon in the divestiture, including the CA&O Plant and utilities. However, Westlake filed legal proceedings against Goodrich, claiming that the transfer of assets and impending IPO triggered the right of first refusal to purchase the CA&O Plant and utilities from Goodrich under the 1990 Agreement. As a result of Westlake's actions, the utilities and CA&O Plant were pulled back from the transaction at the last moment. Hence, Goodrich did not transfer ownership of the CA&O Plant assets and certain utilities at the Site in connection with the 1993 Bill of Sale and 1993 Separation Agreement, but did transfer all of its liabilities associated with the Calvert City Site, including all environmental liabilities and all existing and future obligations under the Permit and PCAP.

Geon's agreement to assume Goodrich's Calvert City obligations and to indemnify Goodrich for such obligations is set out in the 1993 Amended and Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA"). The 1993 ALIA along with the 1993 Separation Agreement and 1993 Bill of Sale are referred to collectively as the "1993 Agreements." Generally, Geon assumed all of Goodrich's obligations and liabilities relating to the Goodrich PVC Business, which was defined to include all of Goodrich's Calvert City environmental liabilities and obligations

associated with the EDC/VCM Plant, the CA&O Plant, the RCRA Permit and other permits, the PCAP, and the Calvert City Environmental Sites, and all of Goodrich's liabilities to Westlake arising out of the operation of the assets transferred to Westlake under the 1990 Agreement.  The 1993 Separation Agreement states:

> It is the intent of the parties that any and all liabilities of the Goodrich PVC Business, disclosed or undisclosed, heretofore or hereafter arising, of every nature whatsoever be transferred to and assumed by Geon and that Geon indemnify and hold Goodrich harmless with respect thereto.

This direct assumption of liabilities was accompanied by a series of parallel indemnity obligations on Geon's part.

The 1993 ALIA provided PolyOne, as Geon's successor, with the right to prosecute in Goodrich's name, any claims Goodrich may have against third parties for contractual indemnity:

> PROVIDED FURTHER THAT Goodrich shall make available to [PolyOne] to the extent it can (but without the obligation for Goodrich to incur any costs or assume any liabilities) the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by [PolyOne] hereby.

As part of the 1993 Agreements that separated the companies, PolyOne agreed to become the permittee under the Permit and accept ownership of certain real property located at the chemical facilities owned and operated by Goodrich's former Geon Vinyls Division in Calvert City.[2] PolyOne also agreed to become the owner of three tracts of real property known as the "Environmental Sites;" the former settlement ponds 1A and 2 and the RCRA Closure Cell, the Superfund Site, and the property on which C-Stripper is sited.  PolyOne also agreed to take control of remediation activities at the Site in the 1993 ESA.

---

[2] The 1993 Environmental Services Agreement ("ESA") states that PolyOne "shall be the permitee of the RCRA and HSWA ("Hazardous and Solid Waste Amendments") permits."

The 1993 Separation Agreement provided that transfers of real property under the 1993 Agreements "shall be effected by quit claim deed or assignment of leasehold interests without representation or warranties of any kind by the transferor." Goodrich tendered a quit claim deed and easements to transfer the three Environmental Sites to PolyOne in 1997, but PolyOne did not act to execute the documents.

In connection with the 1993 sale, Goodrich agreed to provide PolyOne with utilities and employees to operate the C-Stripper at PolyOne's expense, "[t]o the extent that [Goodrich] has utilities and properly-trained manpower available at the Plant Site." Goodrich provided employees and utilities to PolyOne from the date of the 1993 divestiture until Goodrich sold the CA&O Plant and Utilities to Westlake in 1997. Before the sale of the CA&O Plant and utility units, Goodrich billed PolyOne on a monthly basis for C-Stripper services and PolyOne paid the invoices through the date of the sale to Westlake.

In the IPO documents filed with the SEC and given to the public, Goodrich represented that it had accruals approximating $33,000,000 to cover future environmental remediation expenditures of which approximately $16,000,000 was attributable to future remediation expenditures at the Site.[3] The IPO documents also noted:

> Risks of substantial costs and liabilities are inherent in certain plant operations and certain products produced at the Company's plants, as is the case with other companies involved in the PVC industry, and there can be no assurance that significant costs and liabilities will not be incurred by the Company in the future.

---

[3] Goodrich offered shares of PolyOne to the public in two different IPOs. The fist sale was for 13 million shares and is reflected in a Prospectus dated April 29, 1993. In this Prospectus, Goodrich represented the cost of remediation for the Site as approximately $20,000,000. Goodrich sold its remaining 12.9 million shares pursuant to a Prospectus dated November 23, 1993. In this Prospectus, PolyOne's cost to remediate the Site was estimated at $16,000,000.

6

It is also possible that other developments, such as increasingly strict environmental, safety and health laws, regulations and enforcement policies thereunder and claims for damages to property or persons resulting from plant emissions or products, could result in substantial costs and liabilities to the Company in the future.

The legal proceedings initiated by Westlake against Goodrich in 1993 to compel the exercise of its right of first refusal under the 1990 Agreement to purchase the CA&O facilities were concluded in 1996.  Westlake and Goodrich agreed to condition Westlake's purchase at a price fixed by a valuation professional by a date certain.  An issue arose as to whether Westlake's purchase of the CA&O Plant would cause the regulators to require Westlake to become a permittee under Goodrich's Permit.  Westlake strongly urged the regulators that it not become a permittee under Goodrich's Permit as a result of the contemplated sale, whereas Goodrich strongly urged the regulators that Westlake should become a permittee.[4]  In the end, Westlake allowed the exercise date to pass without consummating the purchase of the CA&O Plant by tendering the fixed price.  Soon after Westlake allowed the exercise date to pass, the regulators issued a letter to the parties advising that Westlake would have to become a co-permittee if it acquired the CA&O Plant.

Not long after the fixed price exercise date passed, the parties began to discuss a possible sale again.[5]  On June 26, 1997, Bill Vore, Westlake's counsel, sent Alex Schoch, Goodrich's Assistant General Counsel, a list of proposed revisions to be added to the Purchase and Sale Agreement.  Vore proposed adding the following section:

Notwithstanding anything in this Purchase and Sale Agreement to the contrary, [Goodrich] shall remain responsible for compliance with the terms and conditions

---

[4]  Goodrich and PolyOne had a mutual goal at this time of getting Westlake on the Permit.

[5]  Steven R. Guidry, a vice president of Goodrich at the time of the transaction, testified that "the business transaction changed from, 'Get Westlake on the permit' to 'Sell it.'"

of [the RCRA Permit] regarding the investigation and remediation of soil or groundwater contamination on, below, or emanating from the Facilities that results from [Goodrich's] ownership or operation of the Facilities, or any condition or alleged condition existing prior to the Closing Date. [Goodrich] shall formally request prior to the Closing Date that all applicable Governmental Authorities allow it and [PolyOne] to serve as the sole permittees on the RCRA Permit and shall use its best efforts to obtain approval of its request. [Goodrich] shall not seek to transfer the RCRA Permit or any renewal of the RCRA Permit or any of the responsibilities thereunder to Westlake without Westlake's agreement and further shall vigorously oppose any effort initiated by any person to transfer the Permit or any responsibilities thereunder to Westlake without Westlake's agreement.

After reviewing the proposed section, Schoch wrote to the side the words "side letter." On July 16, 1997, David Bonner, a senior vice-president of Westlake, wrote to Schoch:

This is to confirm the understanding reached today between yourself, representing BFGoodrich and myself, as follows:

Prior to Westlake's Board meeting on July 18, 1997, to consider the acquisition of the BFGoodrich CA&O Plant (as defined), BFGoodrich will provide to Westlake a letter which outlines in detail the common strategy and format of BFG and Westlake's presentation to the State of Kentucky regarding CA&O Plant's RCRA/HSWA permits. Said strategy reflects the parties' views relative to a potential sale of the Calvert City CA&O Plant and shall include the position that there will be no modifications, hearing, or any other changes to the current RCRA/HSWA permits due to a sale of the CA&O Plant. In particular this strategy presumes there is no need to conduct hearings, review permit conditions or include any such third party purchaser of the CA&O Plant (including Westlake) as a permittee on the permits. BFG and Westlake have agreed to use their respective best efforts to implement the foregoing strategy.

Two days later, Schoch confirmed the agreement in a letter to Vore:

This is to confirm that BFG has used and will continue to use its best efforts to implement this strategy. I trust that the Westlake personnel who have been involved in this process will attest to the best efforts and bona fides demonstrated by BFG to date.

On July 16, 1997, Goodrich sold the CA&O Plant and its utility units, including the boiler house that made steam for use at the Site, to Westlake as documented in the Purchase and Sale Agreement as amended August 15, 1997 ("1997 PSA"). When Goodrich sold the CA&O Plant and

8

utilities to Westlake, the Goodrich C-Stripper employees became Westlake employees.  As part of the sale, Goodrich also transferred the former Pond 4 area to Westlake.

In Section 8.3 of the 1997 PSA, Westlake agreed to "indemnify and save [Goodrich] harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA&O Plant by Westlake after the Closing Date."  Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2, "but excluding any condition or event existing, arising or occurring at, on, over or under the CA&O Plant for which Westlake indemnified [Goodrich] pursuant to Section 8.3(c) of the [1990 Agreement]."

On July 16, 1997, Goodrich and Westlake met with the Cabinet, presenting an unsigned draft of an Environmental Services Agreement ("ESA").  The draft ESA stated that "Westlake shall cooperate with Goodrich in all respects for the purpose of Goodrich executing its duties under the Permits."  On July 22, 1997, Goodrich notified the Cabinet via letter:

> [I]n previous correspondence to the Division, Goodrich had indicated that, due to a lack of solid contractual obligations on the parts of both Westlake and Goodrich, Goodrich considered it necessary for Westlake to be a co-permittee on Goodrich's RCRA and HSWA Permits.  However, since that time, the nature of the relationship and the transaction between Westlake and Goodrich has changed substantially. Goodrich's concerns are, and always have been, that the Company must have the ability to meet its obligations under the Permits.  In sharp contrast to the affairs nearly a year ago, Goodrich and Westlake are in the process of negotiating a specific agreement whereby Westlake obligates itself contractually to assist Goodrich so that Goodrich will continue to be able to meet each and every condition contained in the Permits.

Goodrich and Westlake represented to the regulators that this agreement made it unnecessary to add

9

Westlake to the Permit.[6]

On July 29, 1997, the Cabinet determined that Westlake would not have to become a permittee as a result of the 1997 transactions. On August 15, 1997, Goodrich and Westlake entered into an Environmental Services Agreement ("1997 ESA"). The 1997 ESA, among other things, legally bound Westlake to assist Goodrich with many of its obligations under the Permit and to provide Goodrich access to Westlake property as required to comply with the Permit. Goodrich provided a copy of the finalized 1997 ESA to the Cabinet on September 24, 1997. The Cabinet indicated that the 1997 ESA "appears to address many of our concerns regarding the property transfer."

When Goodrich sold the CA&O Plant and the plant utilities to Westlake in 1997, Goodrich

---

[6] Westlake officials made it clear during the course of negotiations with Goodrich that no deal could be reached if Westlake was made a permittee.

In May of 2000, PolyOne officials met with Goodrich officials to discuss remediation and ongoing contamination issues at the Site. Greg Ruttman, PolyOne's general counsel, testified:

> At that meeting I specifically asked the question, was there any understanding or agreement as part of your '97 sale to westlake concerning the permit. Alex Schoch said there is no binding agreement. And I said, what does that mean. He said, well, there is somewhat of a gentleman's understanding that Goodrich remains neutral on the issue of having westlake on the permit. That was very interesting that he said a gentleman's agreement, and I specifically cross-examined him on was there any documents in writing. Answer no.

Ruttman indicated that he was "just floored" when he saw the July 1997 letters between Bonner and Schoch. Ruttman testified that he first saw the letters on December 29, 2006.

Christian Orsborn, involved in environmental activities at the Site since 1967 and employed by PolyOne at the Site from 2000 to the present, stated in his affidavit, "In numerous meetings between PolyOne and Goodrich held between 1997 and 2004, Goodrich repeatedly told PolyOne that it has a 'gentleman's agreement' to keep Westlake off the RCRA permit."

hired Westlake to provide the utilities, labor, and services needed to operate the C-Stripper. Goodrich agreed to reimburse Westlake "for Westlake's costs of providing Waste Water Stripper C Services on the same basis as [PolyOne] has previously reimbursed [Goodrich]."

From August 1997 through December 1999, PolyOne generally paid the C-Stripper invoices when Goodrich sent them.   In December of 1999, PolyOne advised Goodrich that it was commencing short-payments of Goodrich's C-Stripper invoices beginning with a one percent reduction for the November 1999 invoice.  PolyOne's refusal to pay was based on the premise that some portion of the contamination being removed by the C-Stripper was attributable to Westlake's operations.  PolyOne advised that it would increase this set-off to ten percent the following month. PolyOne ultimately made up the difference for its underpayments and began to pay all of the C-Stripper invoices again in 2000 and continued to do so until May of 2002.

On August 30, 2002, PolyOne notified Goodrich that it was suspending further payments for remediation activities at the Site, other than such obligations that were incurred and actually paid by Goodrich prior to June 1, 2002.  PolyOne's actions were based on the receipt of a summary report from Environmental Resources Management ("ERM") dated April 25, 2002, which stated that "as much as 85 percent of the EDC being recovered today is a result of EDC releases that have occurred after 1990 time frames."  In May of 2002, PolyOne requested that Goodrich not pay any pending or future Westlake invoices until the issues had been resolved.  PolyOne decided in 2006 that Westlake's share of C-Stripper costs was at least fifty percent, therefore, PolyOne resumed payment of fifty percent of Goodrich's C-Stripper costs.  PolyOne did not pay any of the past-due invoices from May 2002 though December 2005.

When PolyOne provided Goodrich with a copy of the ERM summary report, Goodrich asked

PolyOne to provide the full report and the data supporting ERM's assertion.  The data was offered to Goodrich on the basis of cost sharing for the report, however Goodrich was not willing to pay the amount asked; therefore, PolyOne refused to provide the data.

In October of 2002, Westlake released over two million pounds of EDC at the Site. Following an investigation, Goodrich advised Westlake that Goodrich would pay Westlake only the percentage of C-Stripper costs that reflected Goodrich's share based upon the contamination attributable to Goodrich operations.

Westlake filed this action against Goodrich on October 16, 2003, seeking to recover the portion of C-Stripper costs Goodrich claimed were attributable to Westlake's releases.  Goodrich notified PolyOne in writing of Westlake's claims on October 21, 2003.  On October 30, 2003, Goodrich, by letter, tendered the defense of the suit to PolyOne.  Goodrich also reminded PolyOne that it had the right to prosecute Goodrich's 1990 Agreement and 1997 PSA indemnity claims against Westlake at its own expense under the 1993 ALIA.  On November 17, 2003, PolyOne declined Goodrich's tender of the defense for the action, stating:

> [N]one of the activities described in Westlake's complaint relate to PolyOne's obligation to assume and discharge those obligations that formed part of the Goodrich PVC Business as of the IPO date.  PolyOne had and has no involvement in deciding whether to make such payments to Westlake, or in any of the decisions Goodrich made in determining to delegate performance of C-Stripper operations to Westlake.

Goodrich directed counsel to conduct its own defense against Westlake's claims, filed a counterclaim against Westlake for indemnity and allocation of responsibility for certain remediation costs under the 1990 Agreement and the 1997 PSA and filed a third party complaint against PolyOne.

On March 29, 2005, the Court granted Westlake's motion for summary judgment against

Goodrich on Westlake's claim.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150,

165 (6th Cir. 1993).

## DISCUSSION

### I.   APPLICABLE LAW

As this is a diversity action, the Court applies the substantive law of Kentucky, including its choice of law standards. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003). The 1993 ALIA provides that it is to be governed by Ohio law. The Sixth Circuit recognizes that Kentucky will enforce contractual choice of law provisions "unless 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.'" *Bank of N.Y. v. Janowick*, 470 F.3d 264, 271 n.3 (6th Cir. 2006) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a) (1999)). At the time of the divestiture, both Goodrich and Geon were headquartered in Ohio. Thus, the Court finds that the choice of Ohio law is reasonable and therefore will apply Ohio law to determine the obligations of the parties under the 1993 Agreements.

### II.   BREACH OF CONTRACT

To establish a breach of contract, Goodrich must show that a contract existed and its performance thereon, breach by Polyone, and damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (applying Ohio law). In *McClorey v. Hamilton County Board of Elections*, an Ohio appellate court summarized principles of contract interpretation that have been articulated by the Supreme Court of Ohio:

> In the construction of a written contract, it will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings. But if the language is ambiguous, then a court must construe the language against the party who prepared the contract. Language is ambiguous if it is reasonably susceptible of two or more constructions.

14

720 N.E.2d 954, 956-57 (Ohio Ct. App. 1998) (quoted in *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 797 (6th Cir. 2003)).

A.      **Failure to Pay for Westlake's Invoices**

PolyOne argues that it is not required to pay remediation costs for contamination caused by Westlake.  PolyOne argues that while the Permit may make Goodrich liable for all remediation, regardless of the source of the contamination, the Indemnity Agreement does not make Polyone liable for all remediation, regardless of its source.  PolyOne cites to the following provision of the 1993 ALIA in support:

> NOTWITHSTANDING ANY OTHER PROVISION OF THIS ASSUMPTION OF LIABILITIES AND INDEMNIFICATION AGREEMENT, this Assumption of Liabilities and Indemnification Agreement is not intended to expand the scope of any liabilities assumed hereunder or to create any liabilities for [PolyOne] that Goodrich did not previously have, and [PolyOne] does not intend hereby to undertake any liability or obligations of any Person other than Goodrich.

PolyOne argues that this provision specifically limits PolyOne's contractual obligation to pay remediation costs to the period prior to 1990 when Goodrich owned the facility and PolyOne has no obligation to reimburse Goodrich for any remediation associated with Westlake's contamination. Goodrich argues that it is required under the Permit to undertake remediation activities at the Site, and, therefore, Polyone is required under the contract to reimburse it for those costs regardless of who caused the contamination of the property.

Under the 1993 ALIA, PolyOne assumed and agreed to pay each and every obligation of Goodrich under the Permit and PCAP subject to the provision cited above.  Hence, this Court must determine whether the remediation of the Site, regardless of the contamination's source, was an obligation Goodrich had incurred at the time of the 1993 contract.

As the sole permittee for the Site, Goodrich is legally obligated to comply or ensure

15

compliance with all conditions of the Permit.  These legal obligations include operating and adequately funding the PCAP, specifically including the C-Stripper.  This legal obligation applies regardless of the source or the timing of the contamination.  Goodrich has been under this obligation since October 29, 1989, the Permit's effective date.  Thus, at the time that the 1993 ALIA was entered into, Goodrich was under a legal obligation to remediate the Site pursuant to the Permit.

This Court finds that pursuant to the 1993 ALIA, PolyOne is obligated to pay for remediation costs associated with the Permit.  This includes the obligation to pay the C-Stripper invoices submitted by Westlake.  Although this remediation may represent in part contamination caused by Westlake, requiring PolyOne to pay such invoices does not create a liability for PolyOne that Goodrich did not have prior to the 1993 ALIA nor does it cause PolyOne to undertake any liability or obligation of a person other than Goodrich.[7]  Goodrich is obligated under the Permit to remediate contamination regardless of source and has been so obligated since the Permit was issued in 1989.

Although Goodrich estimated remediation liability at the Site at $16,000,000, it also noted that there could be no assurance that significant costs and liabilities would not be incurred by the Company in the future.  Thus, PolyOne's risk was not capped at $16,000,000.

**B.   Failure to Defend**

Goodrich argues that PolyOne breached the 1993 Agreements by failing to defend Goodrich in this action.

A duty to defend is separate and distinct from the duty to indemnify.  *Stychno v. Ohio Edison*

---

[7]  The Court notes that pursuant to the agreements between Goodrich and Westlake, Goodrich is entitled to indemnification from any remediation it undertakes pursuant to activities conducted by Westlake.  The 1993 ALIA provides that PolyOne is entitled to the benefits of this indemnification agreement.

*Co.*, 806 F. Supp. 663, 670 (N.D. Ohio 1992). "An indemnitor's duty to defend under an indemnity contract is subject to the same standard as an insurer's duty to defend under an insurance contract. An insurer is required to defend where allegations in a complaint are *potentially* within policy coverage or where some doubt exists about coverage." *Huffy Corp. v. Aral Indus. Co.*, No. 98-3653, 1999 U.S. App. LEXIS 17963, at *9 (6th Cir. July 26, 1999); *see also Stychno*, 806 F. Supp. at 671. Even "where the [indemnitor's] duty to defend is not apparent from the pleadings in the case against the [indemnitee], but the allegations do state a claim which is potentially or arguably within the [agreement], or there is some doubt as to whether a theory of recovery within the [agreement] has been pleaded, the [indemnitor] must accept the defense of the claim." *Willoughby Hills v. Cincinnati Ins. Co.*, 459 N.E.2d 555, 558 (Ohio 1984). The obligation to defend continues until the claim is confined to a recovery beyond the scope of the indemnification agreement. *Huffy*, 1999 U.S. App. LEXIS 17963, at *9-10.

In the 1993 ALIA, PolyOne agreed to "defend and indemnify Goodrich, from every claim, demand, obligation, liability, cost and expense . . . relating to or arising out of the Goodrich PVC business . . . and/or . . . each and every obligation of Goodrich specifically described" in the 1993 ALIA. If an action is brought or a claim made against Goodrich, and Goodrich determines that indemnification may be sought from PolyOne for that claim or action, in whole or in part, Goodrich is to notify PolyOne of the claim or action in writing and PolyOne "shall assume the defense of such action or claim, including the employment of counsel," subject to certain exceptions. In the event that PolyOne refuses to do so, Goodrich "shall be entitled, upon notice to [PolyOne], to employ its own counsel and retain control of its own defense, but at the expense of [PolyOne].

Following Westlake's filing of the instant action, Goodrich notified PolyOne of Westlake's

17

complaint and tendered its defense to PolyOne.  PolyOne refused this tender of defense.

Westlake sought in this action to recover for the cost of operating C-Stripper.  As discussed above, PolyOne assumed Goodrich's remediation obligations under the Permit and PCAP, including the costs associated with operating C-Stripper.  Thus, Westlake's complaint is within the scope of PolyOne's indemnification obligations.  Pursuant to the 1993 ALIA, PolyOne was required to assume the defense of the claim upon Goodrich's notification and since it did not chose to do so is required to reimburse Goodrich for the costs Goodrich has incurred in defending the claim.

## C.  PolyOne Asserts Breach of Contract

PolyOne contends that Goodrich breached its duty as an indemnitee to PolyOne under the 1993 ALIA by entering into the side letter agreement with Westlake.  PolyOne argues that by agreeing to keep Westlake off the Permit, Goodrich enabled Westlake to continue contaminating after 1997, thereby increasing PolyOne's remediation costs.  PolyOne asserts that Goodrich's breach voids any duty of PolyOne to bear the cost of remediation or of Goodrich's defense.

"Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract."  *Waste Mgmt., Inc. v. Danis Indus. Corp.*, 257 F. Supp. 2d 1076, 1084 (S.D. Ohio 2003).

PolyOne cites to the case of *Dana Corp. v. Fireman's Fund Insurance Co.*, in support of its position.  In *Dana Corp.*, a dispute arose regarding indemnification of payment for asbestos exposure claims under an indemnification agreement between the parties. 169 F. Supp. 2d 732, 733-34 (N.D. Ohio 1999).  Dana Corporation had sold its stock in a wholly owned subsidiary, Smith & Kanzler Company, to the Philip Carey Corporation.  *Id.*  Both Smith & Kanzler and Philip Carey

18

manufactured asbestos products. *Id.* at 734. As part of the sale, Dana agreed to indemnify Philip Carey against all obligations and liabilities of Smith & Kanzler arising on or before the date of sale. *Id.*

After the sale, Philip Carey, an Ohio corporation, renamed Smith & Kanzler as Philip Carey of New Jersey. *Id.* Philip Carey of Ohio, while still owning all the stock of Philip Carey of New Jersey, merged into the Briggs Manufacturing Company. *Id.* Briggs Manufacturing, while still owning all stock of Philip Carey of New Jersey, changed its name to Panacon Corporation. *Id.* Panacon then merged Philip Carey of New Jersey into itself. *Id.* Celotex Corporation, also a manufacturer of asbestos containing products, then merged with Panacon. *Id.* Ten years later, Celotex was sued in asbestos injury cases. *Id.* Celotex claimed that Dana was obligated to indemnify Celotex for all losses arising out of Smith & Kanzler asbestos products. *Id.*

Dana filed a motion for summary judgment, contending that it should not be held liable for those claims because Philip Carey had expanded the scope of indemnification through its mergers. *Id.* at 742. Dana contended that, due to the subsequent merger of Philip Carey of New Jersey into Panacon, Dana lost its ability to utilize the shareholder immunity defense. *Id.* Dana argued that because it lost the advantage of this potential defense, it should be absolved of any indemnity obligations. *Id.* Finding that Dana's risk had been materially altered by the increase in Philip Carey's possible liability when Panacon voluntarily shredded the corporate veil between it and the successor to the original Smith & Kanzler company, the court held that Dana was relieved of its obligations to indemnify. *Id.* at 743.

Ohio courts have similarly held that "a guarantor is discharged from liability whenever the terms of the contract or the nature of the obligation guaranteed is materially altered without the

guarantor's consent." *Chase Bank of Ohio v. Brookstone Ohio P'ship*, 1990 Ohio App. LEXIS 764, at *2 (Ohio Ct. App. Mar. 5, 1990), *quoted in Dana Corp.*, 169 F. Supp. 2d at 743. This requirement of notice and consent is equally applicable in the context of indemnity agreements. *Dana Corp.*, 169 F. Supp. 2d at 743.

PolyOne contends that Goodrich materially altered PolyOne's risk by entering into the side letter agreement. PolyOne asserts that when it entered into the 1993 ALIA, Goodrich represented that remediation at Calvert City would cost $16,000,000. PolyOne states that they have spent more than $29,000,000 to date on remediation. PolyOne maintains that it is ultimately only liable for Goodrich's remediation costs and that Goodrich's lobbying to keep Westlake off the Permit created a situation in which it is difficult to distinguish between Goodrich's contamination and Westlake's contamination.

However, as determined above, pursuant to the 1993 ALIA, PolyOne is required to indemnify Goodrich for contamination at the Site regardless of source. PolyOne's remediation costs were not capped. Thus, any increased difficulty regarding the distinguishment of the source of contamination is of no consequence to PolyOne's indemnification obligations.[8]

Therefore, the Court finds that Goodrich did not materially alter PolyOne's risk by executing any side agreement with Westlake.

**D.   Breach of Fiduciary Duty**

PolyOne argues that Goodrich breached its fiduciary duties to PolyOne by transferring

---

[8] The Court notes that as the operator of the facility, Westlake is required to clean up all releases of contamination at the facility and to report all releases of a reportable quantity. *See* 42 U.S.C. § 9607(a); KRS 224.01-400; *United States v. Township of Brighton*, 153 F.3d 307, 312, 313-14 (6th Cir. 1998).

20

Goodrich's environmental liabilities at the Site in 1993 to PolyOne without transferring any of the assets necessary to conduct remediation; entering into the side letter agreement in 1997 with Westlake; and by knowingly permitting Westlake to pollute the Site.   PolyOne asserts that Goodrich's breach voids any duty of PolyOne to bear the cost of remediation or of Goodrich's defense.  Goodrich argues that it never owed a fiduciary duty to PolyOne.

A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom.  *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988).

> A fiduciary relationship creates the highest order of duty imposed by law.  If a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal . . .  In a fiduciary relationship, the fiduciary must make every effort to avoid having his own interests conflict with those of the principal . . . When conflict is unavoidable the fiduciary must place the interests of the principal above his own.

*In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002).

"A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing."  *Id.*  This distinction was described by the Texas Supreme Court in *Crim Truck & Tractor Co. v. Navistart International Transportation Corp.*:

> The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.
> . . .
> The fact that one buisnessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship.  Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract.  Neither is the fact that the  relationship has been a cordial one, of long duration, evidence of a confidential relationship.

823 S.W.2d 591, 594-95 (Tex. 1992), *quoted in In re Sallee*, 286 F.3d at 891.

21

### 1. 1993 Divestiture

PolyOne argues that Goodrich owed it as a fiduciary duty as Goodrich served as promoters for PolyOne by creating PolyOne.  Goodrich asserts that no such duty is owed as no fiduciary duty attaches when a corporation forms a subsidiary for the purposes of divesting itself from assets and/or liabilities.

Goodrich cites to *Aviall, Inc. v. Ryder Systems, Inc.*, in support of its contention that it owes no fiduciary duty to PolyOne on the basis of the 1993 divestiture.  In *Aviall*, Ryder divested Aviall as part of corporate reorganization.  913 F. Supp. 826, 828 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997).  After the divestment, a dispute arose between Ryder and Aviall over a contractual allocation of pension plan liabilities.  *Id.* at 829-30.  Aviall filed suit against Ryder, contending that the division of liabilities was part of an unenforceable adhesion contract.[9]  *Id.* at 831.  The Court disagreed, noting:

> The spin-off procedure that Aviall decries as oppressive, however, is entirely consistent with traditional principles of corporate governance.  When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders . . . In other words, those who operate the parent company owe no fiduciary duties to the wholly owned subsidiary, and even when the parent company announces a proposed spin-off of the subsidiary, the directors of the parent and the directors of the subsidiary owe no fiduciary duties to the soon-to-be-independent subsidiary's prospective stockholders.

*Id.* at 832 (citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)) (internal citations omitted).

---

[9]  "Aviall argue[d] that Ryder dictated the terms of the agreement, and that there was no negotiation at all.  Specifically, Aviall complain[ed] that Ryder did not provide it with independent counsel, that Ryder's counsel drafted the entire Agreement and that a Ryder officer signed the Agreement on Aviall's behalf."  *Id.* at 832.

The weight of authority holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary. *See Anadarko*, 545 A.22d at 1174; *Abex, Inc. v. Koll Real Estate Group, Inc.*, No. 13462, 1994 Del. Ch. LEXIS 213, at *49 (Del. Ch. Dec. 22, 1994); *Richardson v. Reliance Nat'l Indem. Co.*, No. C 99-2952 CRB, 2000 U.S. Dist. LEXIS 2838, at *33 (N.D. Cal. Mar. 14, 2000) (under California law, directors of subsidiary corporation owe duty to parent corporation and its shareholders, not subsidiary); *Household Reinsurance Co., Ltd. v. Travelers Ins. Co.*, No. 91 C 1308, 1992 U.S. Dist. LEXIS 1006, at *9 (N.D. Ill. Jan. 31, 1992) ("Under Minnesota law, a 100% shareholder does not owe a fiduciary duty to the wholly owned corporation"); *Resolution Trust Corp. v. Bonner*, No. H-92-430, 1993 U.S. Dist. LEXIS 11107, at *6-7 (S.D. Tex. June 3, 1993).

The Court finds that the 1993 divestiture did not create a fiduciary relationship between Goodrich and PolyOne.

## 2. De Facto Fiduciary Relationship

PolyOne also argues that the parties had a de facto fiduciary relationship based on the 1993 ALIA, Goodrich's control over PolyOne's remediation efforts, and Goodrich's position of superiority due to the Permit.  PolyOne asserts that Goodrich owed duties to PolyOne to avoid increasing its indemnity obligations, to disclose information that would allow PolyOne to protect its assets, and to act reasonably to protect PolyOne from liability.  Goodrich argues that PolyOne's failure to allege any mutual understanding between itself and Goodrich that it was reposing a special confidence in Goodrich defeats PolyOne's breach of fiduciary argument.[10]

The Ohio Supreme court has recognized that a fiduciary relationship may be created out of

---

[10]    Portions of Goodrich's arguments are taken from Goodrich's Response to PolyOne's Motion for Summary Judgment (Docket #504).

an informal relationship, where both parties understand that a special trust or confidence has been reposed. *Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320, 323 (Ohio 1979), *cited in Ohio Bureau Workers' Comp. v. MDL Active Duration Fund, LTD*, 476 F. Supp. 2d 809, 822 (S.D. Ohio 2007). "A de facto fiduciary relationship may arise from a confidential relationship, in which 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal." *Ohio Bureau Worker's Comp.*, 476 F. Supp. 2d at 822 (quoting *Indermill v. United Sav.*, 451 N.E.2d 538, 541 (1982)). A de facto fiduciary relationship may originate from one party's superior conversance in the subject matter of the transaction. *Prudential Ins. Co. v. Eslick*, 586 F. Supp. 763, 766 (S.D. Ohio 1984).

However, a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust of confidence has been reposed. *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1331-32 (Ohio Ct. App. 1993). Such a confidential relationship cannot be unilateral, *id.*; the parties must agree that one is acting in the best interest of the other, *In re Sallee*, 286 F.3d at 893.

PolyOne argues that it "had no choice but to rely upon Goodrich in controlling Westlake's contamination and limiting PolyOne's liability to that which it assumed under its Agreement with Goodrich. And Goodrich knew from 1993 on that PolyOne had no alternative but to rely upon Goodrich."[11] PolyOne has established that there are factual disputes regarding its and Goodrich's understanding as to whether Goodrich was acting in PolyOne's best interests. Such a factual dispute precludes this Court from determining whether there was a de facto fiduciary relationship. *See*

---

[11] The quoted statement is from PolyOne's reply brief in support of its Motion for Summary Judgment (Docket #530).

24

*Prudential*, 586 F. Supp. at 766 (stating that the existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of each case).

**3. Damages**

PolyOne asserts that it has suffered immeasurable harm from Goodrich's breach of fiduciary duty. PolyOne states that although Goodrich determined in 1993 that the cost of remediating the Site would be $16,000,000, to date PolyOne has paid over $29,000,000 in remediation costs; a substantial portion of which is attributable to Westlake contamination.

As stated previously, under the 1993 ALIA, PolyOne is obligated to pay remediation costs for contamination at the Site regardless of source. This obligation was not limited to a set dollar amount. However, PolyOne is entitled to the benefit of any assumption of liability or indemnification provision in any agreement Goodrich has with third parties with respect to liabilities assumed by PolyOne. Pursuant to the 1990 Agreement and the 1997 PSA, Westlake must indemnify Goodrich for any remediation of soil, surface water, or groundwater attributable to events occurring after the relevant closing dates and arising from Westlake's use or ownership of the VCM or CA&O Plants. Thus, PolyOne has the right to recover any funds it pays out for the remediation of Westlake's waste by way of these indemnification provisions. Therefore, any additional contamination that Westlake caused or may cause at the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.

Therefore, PolyOne's claim of breach of fiduciary duty fails as a matter of law.[12]

_____

[12] Having found no damages, this Court finds it unnecessary to address the parties' arguments concerning breach of fiduciary duty.

### III.   AFFIRMATIVE DEFENSES

PolyOne asserts numerous affirmative defenses to Goodrich's claims.  PolyOne bears the burden of proving these affirmative defenses.  *See Dixon v. United States*, 126 S. Ct. 2437, 2443 (2006).

### A.   Public Policy

PolyOne asserts that Goodrich's side letter impeded PolyOne's efforts to remediate the Site and was contrary to public policy.  PolyOne contends that if Westlake had been on the Permit, it would have been forced to halt its contamination, which is in the public's interest in environmental health and safety.

In general, parties have complete freedom to enter into a contract; however, that freedom is limited by public policy reasons.  *Brandon/Wiant Co. v. Teamor*, 708 N.E.2d 1024, 1028 (Ohio Ct. App. 1998).  "Public policy is a legal principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare."  *Id.*  The doctrine of public policy must be applied with caution so as to not infringe on the parties' rights to make contracts which are not clearly opposed to some principle or policy of law.  *Id.*

Certain kinds of indemnity agreements are forbidden under Ohio law.  *See* ORC § 2305.31 (construction contracts); ORC § 4123.82 (workers' compensation benefits).  However, in the absence of specific public policy exceptions, an agreement to indemnify another is generally enforceable.  *Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 257 (Ohio 1987).

As an operator of the facility, Westlake is required to clean up all releases of contamination at the facility and to report all releases of a reportable quantity.  *See* 42 U.S.C. § 1607(A); KRS § 224.01-400; *United States v. Township of Brighton*, 153 F.3d 307, 312, 313-14 (6th Cir. 1998).

Westlake is required to undertake these obligations regardless of whether it is a permittee on the Permit. Additionally, Goodrich must operate and adequately fund the PCAP for the entire Site. Pursuant to the agreements between Goodrich and Westlake, Goodrich is entitled to indemnification for any remediation it undertakes pursuant to activities conducted by Westlake.

The Court finds that the side letter was not contrary to public policy. There has been no showing that the side agreement affected environmental health or safety. Westlake remains obligated, pursuant to state and federal statutes, to clean up releases of contamination and Goodrich is responsible under the Permit for operating the PCAP for the entire Site. Therefore, this Court finds that PolyOne's public policy defense is not viable.

## B.      Estoppel, Fraud, and Misrepresentation

PolyOne also asserts that it is entitled to equitable estoppel due to Goodrich's fraud and misrepresentations concerning Westlake's addition to the Permit and the attending side agreement.

Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment. *State ex rel. Chavis v. Sycamore City Sch. Dist. Bd. of Educ.*, 641 N.E.2d 188, 196 (Ohio 1994). There are four elements to equitable estoppel under Ohio law: (1) factual misrepresentation; (2) that is misleading; (3) which induced actual reliance which is reasonable and in good faith; and (4) which caused detriment to the relying party. *Elliott v. Elliott*, 859 N.E.2d 575, 577 (Ohio Ct. App. 2006). PolyOne argues that it relied on Goodrich's misrepresentations and believed that Goodrich would continue to advocate that Westlake be added to the Permit and as a result of the misrepresentations PolyOne was unwittingly saddled with the cost of remediating Westlake's contamination.

As determined above, any additional contamination that Westlake caused or may cause at

27

the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination. Therefore, the Court finds that PolyOne has failed to establish a prima facie case of equitable estoppel.

## C.   Unclean Hands

PolyOne asserts that Goodrich's claims are barred by unclean hands. Goodrich argues that the doctrine of clean hands is unavailable to PolyOne as Goodrich does not seek equitable relief in Counts I and II of the third party complaint and also because PolyOne has failed to show that Goodrich is guilty of the type of reprehensible conduct necessary for this defense.

The clean hands doctrine provides that "a party cannot come to the court seeking equity where that party has engaged in reprehensible conduct with respect to the subject matter of the action." *O'Brien v. Ohio State Univ.*, 859 N.E.2d 607, 618 n.3 (Ohio Ct. Cl. 2006). This doctrine is equitable and thus is unavailable in actions at law for damages. *Id.*

In Count I, Goodrich seeks not only damages, but also declaratory relief under the Federal Declaratory Judgment Act. Goodrich seeks a declaratory judgment that PolyOne will assume and pay, perform, or discharge Goodrich's future groundwater remediation liabilities, obligations, and costs and the Permit and PCAP costs as they become due and payable.

The Sixth Circuit has stated that the remedy afforded under the Federal Declaratory Judgment Act is equitable in form. *Am. Airlines, Inc. v. Louisville & Jefferson County Air. Bd.*, 269 F.2d 811, 824 (6th Cir. 1959). Goodrich is seeking an equitable remedy and therefore the defense of unclean hands is applicable to the portion of Count I requesting a declaratory judgment.

This Court finds that any misrepresentations made by Goodrich did not arise to the level of reprehensibility, which is required to prevent a party from seeking equitable relief under the clean

hands doctrine.  As determined above, the side agreement did not increase PolyOne's liability as PolyOne retains the contractual right to recover any funds it expends on remediating Westlake's contamination.  Thus any concealment or misrepresentations concerning the side agreement did not damage PolyOne.  Therefore, this Court finds that PolyOne's assertion of the clean hands doctrine is not a viable defense.

## D.     Waiver and Offset

PolyOne asserts defenses of waiver and offset.  Goodrich argues that PolyOne cannot show a voluntary relinquishment of a known right to support a waiver defense.  Goodrich also argues that there are no unrelated transactions between Goodrich and PolyOne under which Goodrich owes anything to PolyOne that might offset PolyOne's liability to Goodrich.

"Waiver is the voluntary surrender or relinquishment of a known legal right or intentionally doing of an act inconsistent with claiming it."  *Baughman v. State Farm Mut. Auto. Ins. Co.*, 828 N.E.2d 211, 214 (Ohio Ct. App. 2005) (quoting *Marfield v. Cincinnati, D&T Traction Co.*, 144 N.E. 689, 691 (Ohio 1924)).  PolyOne argues that Godorich waived its right to seek damages under the Indemnity Agreement because it entered into the side letter agreement and hid it from PolyOne and the Cabinet.  PolyOne states that Goodrich's actions were inconsistent with its rights under the Indemnity Agreement because they increased PolyOne's liabilities.

The Court finds that PolyOne's claim of waiver is more appropriately styled as a claim of equitable estoppel, which the Court has previously addressed.

The doctrine of offset is "a demand asserted to diminish or extinguish plaintiff's demand, which arises out of a transaction different from that sued on, and which must be liquidated and emerge from a contract or judgment."  *Cont'l Acceptance Corp. v. Rivera*, 363 N.E.2d 772, 777 n.18

29

(Ohio Ct. App. 1976) (quoting *Bull v. United States*, 295 U.S. 247, 262 (1934)).  PolyOne asserts that Goodrich has received settlement funds from several of its insurers for the remediation costs at issue.  PolyOne states that in some situations PolyOne paid the full amount of certain invoices although Goodrich received insurance proceeds for the same invoices.  Goodrich has credited PolyOne for those insurance payments, but has never paid them to PolyOne.  PolyOne asserts that it is entitled to offset any recovery by Goodrich in the amount of those insurance proceeds.

Under the 1993 ALIA, PolyOne assumed liability only "to the extent such obligations and liabilities are not covered under any insurance policy or policies insuring Goodrich."  Thus the Court finds that any recovery by Goodrich from PolyOne for the unpaid C-Stripper invoices must be offset by the amount of insurance money it has received for those invoices.

## E.      Failure to Mitigate

PolyOne asserts that Goodrich failed to mitigate its damages by entering into the side letter agreement that enabled Westlake to continue to contaminate the Site.  PolyOne argues that if Goodrich had worked to get Westlake on the Permit or enforced its indemnification agreement with Westlake under their 1990 contract, Westlake's contamination would have either halted or, at the very least, been reduced.  PolyOne states that this would have lowered the remediation costs that Goodrich is now demanding PolyOne pay.

As determined above, any additional contamination that Westlake caused or may cause at the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.

Therefore, this Court finds that PolyOne's defense of failure to mitigate is not viable.

## F.      Acts of Third Parties

PolyOne assets that it is not responsible for the contamination of third parties under the "NOTWITHSTANDING" provision of the 1993 ALIA, and therefore is not responsible for Westlake's contamination.

As determined above, pursuant to the 1993 ALIA, PolyOne is required to indemnify Goodrich for contamination at the Site regardless of source. Therefore, this Court finds that PolyOne's third parties defense is not viable.

## G.    Consideration

PolyOne asserts that although it received assets and liabilities from Goodrich at other facilities pursuant to the 1993 Agreements, Goodrich failed to transfer any assets to PolyOne at the Calvert City Site, including those assets essential for PolyOne to conduct its remediation obligations.

Lack of consideration to support a contract is sufficient to permit its cancellation. *Mooney v. Green*, 446 N.E.2d 1135, 1138 (Ohio Ct. App. 1982). "Valuable consideration may be either a detriment to the promisee or a benefit to the promisor." *Id.* Courts will not inquire into the adequacy of the consideration, unless the absence of consideration was such as to constitute fraud or unfair treatment. *Id.*

PolyOne admits that it received assets as part of the 1993 Agreement, although they were not located at the Calvert City Site. Hence there was consideration for the contract. Thus, PolyOne's defense of failure of consideration is not viable.

## H.    Frustration of Purpose

PolyOne asserts that, by way of the side letter agreement, Goodrich expanded the scope of PolyOne's liabilities and forced PolyOne to pay for Westlake's contamination in addition to paying for Goodrich's contamination. PolyOne argues that because the principal purpose of the 1993 ALIA

31

was for PolyOne to indemnify Goodrich exclusively for Goodrich's contamination, Goodrich's actions frustrated the purpose of the 1993 ALIA.

The doctrine of frustration of purpose provides that:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

*Donald-Harris Law Firm v. Dwight Killian*, 853 N.E.2d 364, 367-68 (Ohio Ct. App. 2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS §265 (1981)).  The doctrine of frustration of purpose is not widely accepted in Ohio.  *Id.* at 368.

As determined above, pursuant to the 1993 ALIA, PolyOne is required to indemnify Goodrich for contamination at the Site regardless of source.  Thus, the side agreement letter did not frustrate the purpose of the 1993 ALIA.

Therefore, this Court finds that PolyOne's defense of frustration of purpose is not viable.

I.      **Prevention of Performance**

PolyOne argues that in 1997 Goodrich hindered PolyOne's remediation activities by placing limitations on Orsborn's movement about the Site, his ability to inspect facilities, and his correspondence with government agencies.  PolyOne asserts that these limitations allowed Westlake to continue contaminating the Site, which increased PolyOne's remediation costs.

Each party to a contract is under an implied obligation to cooperate in the performance of a contract and to restrain from doing any act that would delay or prevent performance of the contract.  *See Synergy Mech. Contrs. v. Kirk Williams Co.*, No. 98AP-431, 1998 Ohio App. LEXIS 6430, at *12 (Ohio Ct. App. Dec. 22, 1998).

As determined above, any additional contamination that Westlake caused or may cause at the Site will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.  Therefore, this Court finds that PolyOne's defense of prevention of performance is not viable.

**J.      Breach of 1993 ALIA**

PolyOne asserts that Goodrich breached the 1993 ALIA by entering into the side letter agreement and increasing the scope of PolyOne's obligations under the contract.  PolyOne also argues that Goodrich breached the 1993 ALIA when it failed to notify and consult with PolyOne when the Cabinet sought additional information from Goodrich following its meeting with the Cabinet in July of 1997.

"Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract."  *Waste Mgmt., Inc.*, 257 F. Supp. 2d at 1084.  To establish a breach of contract, PolyOne must show that a contract existed and its performance thereon, breach by Goodrich, and damages.  *Pavlovich*, 435 F.3d at 565.

As determined above, the scope of PolyOne's obligations under the 1993 ALIA were not increased by the side agreement as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.  As this side agreement did not increase PolyOne's obligations or costs, PolyOne has also failed to show damages from Goodrich's failure to notify and consult with PolyOne following the Cabinet's request for additional information.  Therefore, PolyOne's assertion of Goodrich's breach of contract is not a viable defense.

**K.      Unjust Enrichment**

PolyOne asserts that Goodrich has acted fraudulently and in bad faith by its breach of the 1993 ALIA, its breaches of fiduciary duties, and by willfully allowing Westlake to continue contaminating the Site.  PolyOne claims that Goodrich has been unjustly enriched to the extent it has already received insurance proceeds for the remediation costs it is claiming as damages against PolyOne.  Goodrich asserts that the theory of unjust enrichment does not apply as there existed an explicit contract between itself and PolyOne.

Under Ohio law, a party must prove three elements to succeed in an action for unjust enrichment: (1) a benefit conferred by one party on the other; (2) the receiving party's knowledge of the benefit; and (3) the improper retention of the benefit without the receiving party's rendering of payment.  *Metz v. Am. Elec. Power Co., Inc.*, Nos. 06AP-1161, 06AP-1166, 2007 WL 1991145, at *8 (Ohio Ct. App. July 10, 2007) (citing *Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938)).  A party may maintain a claim for unjust enrichment where the matters in dispute are governed by the terms of an express contract only where there is evidence of fraud or bad faith.  *Id.*

This Court has already determined that PolyOne has failed to assert a breach of the 1993 ALIA or a breach of fiduciary duty.  This Court has also previously determined that any additional contamination that Westlake caused or may cause at the Site will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.  Therefore, this Court finds that PolyOne's assertion of unjust enrichment is not a viable defense.

**L.      Remaining Affirmative Defenses**

PolyOne fails to argue its remaining affirmative defenses.  PolyOne has failed to present any evidence on these defenses.  Thus, this Court finds that the remaining affirmative defenses are not viable.  *See Dixon*, 126 S. Ct. at 2443; *Hartsel*, 87 F.3d at 799.

## IV.   POLYONE'S ABILITY TO CONTEST ALLOCATION

Goodrich argues that PolyOne should be barred from later contesting the final allocation between Goodrich and Westlake of remediation costs.  Goodrich asserts that PolyOne tendered the defense of the action to PolyOne and expressly made available to PolyOne the benefit of its right to indemnity from Westlake.  Goodrich states that although PolyOne improperly rejected Goodrich's tender, PolyOne has actively participated in the action as a third-party defendant.  PolyOne's participation includes its retention of two experts to testify on matters pertaining to contamination of the Site due to Westlake's operations and the allocation of remediation costs to Westlake. Goodrich states that Goodrich and PolyOne have actively cooperated in establishing Westlake's share of responsibility for remediation costs throughout the action.  PolyOne's only response to this claim is that it is moot because PolyOne no longer has any indemnity obligations under the 1993 ALIA due to Goodrich's breaches of its fiduciary and indemnity duties.

When an indemnitor receives notice of an indemnitee's claim and has the opportunity to defend the claim, the indemnitor is bound by the outcome of the litigation between the indemnitee and the party seeking relief from the indemnitee.  *City of Columbus v. Alden E. Stilson & Assocs.*, 630 N.E.2d 59, 63 (Ohio Ct. App. 1993).  This Court has already determined that Goodrich did not breach any fiduciary or indemnity duties and that PolyOne was required to defend Goodrich in the present action.

Therefore, this Court finds that PolyOne is estopped from later contesting the final allocation between Goodrich and Westlake of remediation costs.

## V.   DECLARATORY JUDGMENT

Goodrich asserts that it is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201(a),

holding PolyOne liable to pay all past due Permit and PCAP costs accruing from May 1, 2002 to the present, and requiring PolyOne to pay in full all such ongoing and future costs as they become due and payable, as PolyOne's failure to pay these past costs is a violation of the 1993 Agreements.

Having found that PolyOne is obligated under the 1993 Agreements to indemnify Goodrich for remediation costs at the Site, regardless of source, and having further found that Goodrich did not breach either the 1993 ALIA or a fiduciary duty owed to PolyOne, and having considered the affirmative defenses asserted by PolyOne, this Court finds that Goodrich is entitled to a declaratory judgment that PolyOne is liable to pay all past due Permit and PCAP costs accruing from May 1, 2002 to the present, and requiring PolyOne to pay in full all such ongoing and future costs as the become due and payable subject to the condition that any insurance proceeds received by Goodrich for costs associated with the C-Stripper shall be offset from this recovery.

## CONCLUSION

For the foregoing reasons, Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims is GRANTED.

An appropriate order shall issue.