UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                                      PLAINTIFF

v.

GOODRICH CORPORATION                               DEFENDANT;
                                                                                  THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                               THIRD PARTY DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on Westlake Vinyls, Inc.'s Motion for Summary Judgment on Goodrich Corporation's Counterclaim (Docket #335). Goodrich filed a response (Docket #338) to which Westlake replied (Docket #356). Goodrich then filed a sur-reply (Docket #386). On August 3, 2007, the parties filed simultaneous supplemental briefs (Dockets #541, 548). This matter is now ripe for adjudication. For the reasons that follow, Westlake's Motion for Summary Judgment is DENIED.

**BACKGROUND**

During the 1950s, an industrial park was developed on the southern bank of the Tennessee River near Calvert City, Kentucky. Goodrich purchased approximately 150 acres of that park in 1951 for use as a manufacturing facility ("the Site"). Goodrich produced vinyl chloride monomer ("VCM") at the Site from 1953 to March 1, 1990. Goodrich began to use ethylene dichloride ("EDC"), a feedstock used to produce VCM, to make VCM in 1959 and in 1964 it added a new plant to convert EDC to VCM. The units that made EDC and the units that "cracked" EDC to form VCM

were known collectively as the EDC/VCM Plant. Goodrich also built and operated facilities at the Site that manufactured ethylene and chlorine, the feedstock for EDC, and a byproduct called caustic. This part of the Site was known as the Chlor-Alkali and Olefins Plant ("CA&O Plant").

Waste containing EDC was generated at the Site. Treatment included settlement ponds, landfills, and burn pits. Over a period of time, some of the EDC contained in this waste migrated through the soil to the groundwater underlying the Site.

In June of 1988, the Environmental Protection Agency ("EPA") issued a Record of Decision declaring a portion of the Site, specifically a landfill on the Site's eastern boundary, a "Superfund Site" subject to remediation requirements under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Goodrich was required to secure approval of, implement, complete, and pay for remedial actions approved by the EPA and to provide reimbursement for future oversight costs.

The Kentucky Natural Resources and Environmental Protection Cabinet (the "Cabinet") issued a Hazardous Waste Management Permit to Goodrich effective October 29, 1989. The EPA issued a similar permit under the Hazardous Solid Waste Management Act Amendments ("HWSA") Post-Closure Permit, also effective October 29, 1989. Together the Kentucky and EPA permits form the Resource Conservation and Recovery Act ("RCRA") Part B Permit for the Site.[1]

As the sole permittee, Goodrich must comply or ensure compliance with all terms and

---

[1] RCRA mandates that "each person owning or operating an existing facility . . . for the treatment, storage, or disposal of hazardous waste . . . have a permit. 42 U.S.C. § 6925(a).

The two permits that collectively constituted the RCRA Part B Permit were replaced by one Hazardous Waste Management Permit effective October 30, 2003. Portions pertinent to the instant matter are essentially the same as corresponding portions of the Permit issued in 1989. Those permits are collectively referred to as the "Permit."

2

conditions of the Permit. These legal obligations include:

> To install and maintain a groundwater monitoring system.
>
> To treat all contaminated groundwater under the Site and to treat all contaminated groundwater migrating outside the Site's boundaries to underlying contiguous properties.
>
> To develop and implement a corrective action program to clean up the groundwater to a concentration standard established by law and regulation. The program is known as the Plant-wide Corrective Action Program ("PCAP"). Goodrich's C-Stripper and extraction well system was approved by the regulators as the mandated corrective measure under the PCAP.
>
> To ensure the PCAP complies with the groundwater protection standard.
>
> To both operate and adequately fund the PCAP, specifically including the C-Stripper.
>
> To clean up the groundwater until a demonstration is made that concentrations of targeted contaminants fall below the groundwater protection standard.

Non-compliance with any Permit condition would subject Goodrich to an enforcement action.

On March 1, 1990, pursuant to the Amended and Restated Master Conveyance Agreement ("1990 Agreement"), Goodrich sold the EDC/VCM Plant to Westlake. In Section 8.3 of the 1990 Agreement, Westlake agreed to "indemnify and save Goodrich harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date."[2] Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2.

---

[2] "Liability" is defined in the 1990 Agreement as "any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense, including, without limitation, reasonable fees and disbursements of counsel incurred by the indemnified party in investigating and defending any such claim with reimbursement on a current basis."

3

In Section 8.4(e) of the 1990 Agreement, the parties agreed that:

Nothwithstanding any provision to the contrary included in this Section 8, [Westlake] and Goodrich each hereby waive the right, for either itself or its subsidiaries, to be indemnified by the other party hereunder to the extent of (i) any insurance proceeds or other recovery received by it or its subsidiaries with respect to the Liabilities for which indemnification would otherwise be required hereunder, in excess of the amount of the deductibles under the insurance policies of each party and its subsidiaries, or (ii) to the extent of any reduction of any taxes realized by the occurrence of a Liability after taking into account any taxes imposed on any indemnity payment.

As part of the 1990 Agreement to sell the EDC/VCM Plant, Westlake and Goodrich met with state and federal environmental regulators before the closing to discuss the status of the Permit. Goodrich advocated to the regulators that Westlake not be added to the Permit. Ultimately, the state did not require Westlake to become liable under the Permit; provisions allowing Goodrich access to Westlake's property to conduct its remediation obligations under the Permit were deemed satisfactory.

On July 16, 1997, Goodrich sold the CA&O Plant and its utility units, including the boiler house that made steam for use at the Site, as documented in the Purchase and Sale Agreement as amended August 15, 1997 ("1997 PSA"). Goodrich retained ownership of C-Stripper.

In Section 8.3 of the 1997 PSA, Westlake agreed to "indemnify and save [Goodrich] harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA&O Plant by Westlake after the Closing

4

Date."[3] Goodrich provided a reciprocal indemnity to Westlake with respect to contamination release before the closing date in Section 8.2, "but excluding any condition or event existing, arising, or occurring at, on, over or under the CA&O Plant for which Westlake indemnified [Goodrich] pursuant to Section 8.3(c) of the [1990 Agreement]."

In Section 8.4(d) of the 1997 PSA, the parties agreed that:

Notwithstanding any provision to the contrary included in this Article 8, Westlake and [Goodrich] each hereby waive the right, for either itself or its subsidiaries, to be indemnified by the other party hereunder to the extent of any insurance proceeds or other recovery received by it or its subsidiaries with respect to the Liabilities for which indemnification would otherwise be required hereunder, but such party reserves the right to be indemnified for the amount of the deductibles under such applicable insurance policies of each party and its subsidiaries.

On July 29, 1997, the Cabinet determined that Westlake would not have to become a permittee as a result of the 1997 transaction.

**STANDARD**

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."

---

[3]"Liability" is defined in the 1997 PSA as "any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense, including, without limitation, reasonable fees and disbursements of counsel incurred by [the indemnified party] in investigating and defending any such claim with reimbursement on a current basis."

5

*Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

### I. BURDEN OF PROOF

The parties disagree as to which party bears the burden of proving the occurrence or non-occurrence of the contractual provision limiting liability in Section 8.4(e) of the 1990 Agreement and Section 8.4(d) of the 1997 PSA. Westlake asserts that "Goodrich bears the burden of proving that it has incurred remediation costs in excess of the amounts that Goodrich has already recovered from its insurers." Goodrich states that while it must establish Westlake's indemnity obligations, and the fact and amount of Goodrich's losses due to Westlake's contamination, Goodrich is not

required to prove the non-occurrence of the contractual limitation of liability.

"A party who seeks advantage of an exception in a contractual stipulation as the basis of his claim is charged with the burden of proving facts necessary to bring himself within such exception." *New Britain Mach. Co. v. Yeo*, 358 F.2d 397, 406 (6th Cir. 1966) (quoting *Davies Flying Serv. v. United States*, 216 F.2d 104, 106 (6th Cir. 1954)). In *Zebrowski & Associates, Inc. v. City of Indianapolis*, the Indiana Court of Appeals applied this principle to an indemnity contract, stating, "the burden of proof is on the indemnitee . . . to prove all the material elements of its cause of action by a preponderance of the evidence. The indemnitor . . . must prove any affirmative defenses." 457 N.E.2d 259, 261 (Ind. Ct. App. 1983). The *Zebrowski* court explained the rationale as follows:

> Logic and general principles of law place the burden of proving the existence of the exception on the indemnitor . . . [A] common rule of contract and insurance law states that when performance is promised in general terms, followed by specific exceptions and limitations, the obligor has the burden of proving that the case falls with[in] the exception.

*Id.* at 262 (citing A. CORBIN, CONTRACTS § 751 (1952)). "Proof of the exception to an indemnity claim is an affirmative defense to be raised and proven by the indemnitor." *Id.*; *accord N. Little Rock Elec. Co. v. Pickens-Bond Constr. Co.*, 485 S.W.2d 197, 199 (Ark. 1970); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 126 (Tex. Ct. App. 2002).

Thus, this Court finds that Westlake has the burden of proving the occurrence of the contractual provision limiting liability in Section 8.4(e) of the 1990 Agreement and Section 8.4(d) of the 1997 PSA, as the assertion of these limiting provisions is an affirmative defense. Goodrich retains the burden of establishing Westlake's indemnity obligations and the fact and amount of Goodrich's losses due to any contamination by Westlake.

7

## II.     CONTRACT INTERPRETATION

"[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)). If an ambiguity exists, "the court will gather, if possible, the intent of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions." *Id.* (internal quotation omitted). However, "in the absence of ambiguity a written instrument will be enforced strictly according to its terms." *Id.* (quoting *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)). The Court will "interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.*

## III.     AMOUNTS RECOVERED

Westlake asserts that Goodrich has recovered $108.4 million for remediation costs at the Site. Westlake argues that because Goodrich's recovery is greater than the amount of total remediation costs at the Site, Goodrich is prohibited, pursuant to Section 8.4(e) of the 1990 Agreement and Section 8.4(d) of the 1997 PSA, from demanding indemnification from Westlake as it has incurred no losses related to the Site.

Westlake has provided a breakdown of Goodrich's recoveries of remediation costs at the Site. Westlake asserts that Goodrich has recovered $20.6 million in settlement payments from American Motorist Insurance Company n/k/a Kemper Insurance Company, an additional $3.5 million from Kemper from a buy out of its settlement agreement with Goodrich, $29.3 million from

PolyOne, $35 million from settling with excess insurers in the *Commercial Union* litigation[4], and a $20 million judgment in the *Commercial Union* litigation. Westlake totals this to a sum of $108.4 million. Westlake determines Goodrich's total remediation costs incurred at the Site as of July 2007 to be $82.3 million. Thus, Westlake argues that Goodrich has recovered $26.1 million in excess of costs incurred.

Pursuant to the 1990 Agreement and the 1997 PSA, Goodrich waived the right to indemnification under the relevant contract "to the extent of any insurance proceeds or other recovery received by it or its subsidiaries with respect to the Liabilities for which indemnification would otherwise be required." Under this contractual exclusion each party reserved the right "to be indemnified for the amount of the deductibles under such applicable insurance policies." Westlake asserts that this provision applies to funds paid by PolyOne to Goodrich pursuant to the 1993 Amended and Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA").

Under the 1993 ALIA, PolyOne assumed and agreed to pay each and every obligation of Goodrich under the Permit. Thus, PolyOne was obligated to pay for remediation costs for contamination at the Site regardless of source. The 1993 ALIA provided PolyOne with the right to prosecute in Goodrich's name any claims Goodrich may have against third parties for contractual indemnity:

> PROVIDED FURTHER THAT Goodrich shall make available to [PolyOne] to the extent it can (but without the obligation for Goodrich to incur any costs or assume any liabilities) the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by [PolyOne]

---

[4] The *Commercial Union* litigation was an action by Goodrich in Ohio state and federal courts against forty-five "excess" insurers for remediation costs incurred at the Site.

9

hereby.

In this Court's Memorandum Opinions on Goodrich's Motions for Partial Summary Judgment with respect to its Claims against PolyOne, the Court stated that PolyOne had the right to recover any funds it pays out under the 1993 ALIA for the remediation of Westlake's waste by way of these indemnification provisions. Thus, this Court found that PolyOne was not damaged by any additional contamination at the Site caused by Westlake due to its exclusion from the Permit.

In general, parties have complete freedom to enter into a contract; however, that freedom is limited by public policy reasons. *See Bankers Bond Co. v. Buckingham*, 97 S.W.2d 596, 600 (Ky. 1936).

> [P]ublic policy is usually understood to be the principles under which the freedom of contract and private dealing is restricted by law for the good of the community. Thus certain classes of acts are said to be against public policy and the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interest of the state, apart from illegality or immorality.

*Id.* (internal quotation omitted). The Court finds that the state has an interest in protecting the health of its environment and its people from the effects of pollution. *See, e.g.,* KRS § 224.01-400 (2007); KRS § 2.255 (2007); KRS § 15.255 (2007); KRS § 157.900 (2007).

Under the 1993 ALIA, PolyOne is obligated to pay remediation costs for contamination at the Site regardless of source. Thus, PolyOne is obligated to pay for Westlake's contamination as well as that of Goodrich. Potentially, PolyOne could pay for all costs associated with contamination at the Site. Under Westlake's interpretation of the contractual provision limiting liability in Section 8.4(e) of the 1990 Agreement and Section 8.4(d) of the 1997 PSA, Westlake would be totally absolved from liability for remediation costs at the Site under that scenario. Hence, Westlake could contaminate at will, knowing that it would not bear the burden of the remediation costs. The Court

finds that such a contract would be void as against public policy.[5]

The Court instead reads the contractual provision limiting liability in Section 8.4(e) of the 1990 Agreement and Section 8.4(d) of the 1997 PSA to exclude from its reach any remediation funds Goodrich received from PolyOne pursuant to the 1993 ALIA. The Court finds that the parties limited the meaning of "recovery" in these provisions to recovery from insurance providers. Such a reading is consistent with the provision's exclusion of insurance policy deductibles. Thus, Westlake cannot take into account Goodrich's receipt of remediation funds from PolyOne in determining Goodrich's recoveries of remediation costs at the Site.

Subtracting the amount of Goodrich's recoveries that Westlake allocated towards PolyOne payments, leaves a total recovery, as calculated by Westlake, of $79.1 million.[6] Westlake posited that the total remediation costs at the Site as of July 2007 was $82.3 million. This leaves a deficit

---

[5] The Court notes that in its Memorandum Opinion on Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims against PolyOne, it stated that the side agreement entered into by Goodrich and Westlake was not void as against public policy, finding no showing that the side agreement affected environmental health or safety. There the Court noted that Westlake remained obligated, pursuant to state and federal statutes, to clean up releases of contamination and Goodrich was responsible under the Permit for operating the PCAP for the entire Site. However, this finding was made with the understanding that Westlake was responsible under the indemnification provisions in its contract with Goodrich to indemnify Goodrich for the portion of remediation costs attributed to its contamination. The Court tacitly understood that such responsibility would inhibit Westlake from polluting the Site. In essence, Goodrich, through the various contracts with Westlake and PolyOne, assigned its rights and liabilities to PolyOne. PolyOne merely stood in the place of Goodrich in regard to the Permit obligations and the reciprocal indemnity agreement between Goodrich and Westlake. As noted in the text, payment by PolyOne was not insurance proceeds or recovery as anticipated in the 1990 Agreement or 1997 PSA. Payments were made because of an assignment of liabilities under the Permit. It was not a recovery by Goodrich.

[6] The Court makes no finding in this opinion as to the accuracy of this amount or whether the other listed recovered amounts would be insurance proceeds or other recoveries received by Goodrich or its subsidiaries with respect to the Liabilities which indemnification would otherwise be required pursuant to the 1990 Agreement or the 1997 PSA.

of $3.2 million. As the basis for Westlake's Motion for Summary Judgment relies on the proposition that Goodrich has recovered in excess of total remediation costs incurred at the Site, Westlake arguing that any further amounts recovered by Goodrich from Westlake would constitute an impermissible double recovery, the Court finds that it cannot grant summary judgment at this time.

## CONCLUSION

For the foregoing reasons, Westlake's Motion for Summary Judgment is DENIED.

An appropriate order shall follow.