UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                                                  PLAINTIFF

v.

GOODRICH CORPORATION                                                           DEFENDANT;
                                                                                   THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                                                 THIRD PARTY DEFENDANT

**MEMORANDUM OPINION**

     This matter is before the Court on Goodrich Corporation's Motion for Partial Summary Judgment on its Claim for Specific Performance (Count III) against PolyOne Corporation (Docket #457). PolyOne filed a response (Docket #497) to which Goodrich has replied (Docket #526). This matter is now ripe for adjudication. For the reasons that follow, Goodrich's Motion for Partial Summary Judgment on its Specific Performance Claim is DENIED.

**BACKGROUND**

     Many of the pertinent facts regarding the history fo the Calvert City Site (the "Site") and the applicable contracts are set forth at length in the Court's Memorandum Opinion on Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims; only relevant facts not discussed in that Memorandum Opinion will be described here.

     Effective March 1, 1993, Goodrich transferred substantially all of the assets and liabilities of its PVC business, previously operated as the Geon Vinyls Division, to a new wholly-owned

subsidiary, Geon.[1]

As part of the transactions, Geon agreed to accept ownership of certain real property located at the chemical facilities owned and operated by Goodrich in Calvert City, Kentucky. Specifically, PolyOne agreed to become the owner of all real property owned or leased by Goodrich in Calvert City, subject to certain defined exceptions. Included in the property to be transferred were the "Environmental Sites," which consist of the Superfund site and tracts bordering that site (the "Superfund Tract"), two clean-closed water treatment ponds and a hazardous waste closure cell (the "Pond and Closure Tract"), and the real property on which the C-Stripper is located (the "C-Stripper Tract").

Goodrich originally intended to transfer all of its PVC-related assets at Calvert City to Geon in the divestiture, including the CA&O Plant and utilities. However, Westlake filed legal proceedings against Goodrich, claiming that the transfer of assets and impending IPO triggered the right of first refusal to purchase the CA&O Plant and utilities from Goodrich under the 1990 Agreement. As a result of Westlake's actions, the utilities and CA&O Plant were pulled back from the transaction at the last moment. Hence, Goodrich did not transfer ownership of the CA&O Plant assets and certain utilities at the Site in connection with the 1993 Bill of Sale and 1993 Separation Agreement, but did transfer all of its liabilities associated with the Calvert City Site, including all environmental liabilities and all existing and future obligations under the Permit and PCAP.

The 1993 Separation Agreement expressly describes the manner in which the real properties would be transferred:

<u>Transfer Documents</u>. The parties acknowledge that this Agreement, the Ancillary

---

[1] Geon merged with M.A. Hanna Company in September 2000 to form PolyOne.

> Agreements and any documents in furtherance of the transactions contemplated hereby shall be made without representations or warranties of any kind. All assets, including but not limited to all fixtures, buildings, machinery and equipment shall be transferred on an "AS IS, WHERE IS" basis. Furthermore, all real estate transfers shall be effected by quit claim deed or assignment of leasehold interests without representations or warranties of any kind by the transferor.

The parties also recognized in the 1993 Separation Agreement that it would be necessary to finalize the property transfer after the date of the 1993 Agreements:

> Furthermore, specific documents to transfer assets such as quit claim deeds for real estate had not been prepared and can not be prepared until completion of surveys. The parties agree to complete the Ancillary Agreements and the various schedules to the Ancillary Agreements and to prepare and execute other documentation as may be necessary from time to time.

> The 1993 Bill of Sale identifies which assets were to be transferred to Geon and which ones were to be excluded from the Sale:

> Goodrich, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby grant, bargain, sell, convey, transfer, assign, set over and deliver unto Geon all of the entire right, title and interest of Goodrich in and to . . . the assets and properties described below:
>
> (a)  All land, buildings and improvements, machinery, equipment, furniture, moveables and other assets owned or leased by Goodrich and situated at the locations listed on Schedule I.

One of the locations listed on Schedule I is Calvert City, Kentucky. Schedule I further describes the "Principal Nature of [the] Property" at Calvert City as "(i) Lands which are not subject to option and (ii) Environmental sites."

While the 1993 Bill of Sale provided generally for the transfer of all the real property at Calvert City to Geon, it expressly excluded several Goodrich-owned properties located in Calvert City: "BUT EXCLUDING FROM such grant, bargains, sale, conveyance, transfer, assignment, setting over and delivery: (i) Any right, asset or property listed on Schedule III hereto ("Excluded

3

Assets")". Schedule III contains three entries:

1. The Facilities located at Clavert City, Kentucky, as defined in Section 17.D of the Amended and Restated Separation Agreement, including the 58 acres and approximately 125 acres of land referred to in such Section 17.D.

2. All personal property, motor vehicles, inventories, raw materials, accounts receivables, other working capital, transportation barges and tank cars, and other assets pertaining to or used in the operation of the Facilities.

3. "A" stripper and "B" stripper located at Calvert City, Kentucky.

Section 17.D of the 1993 Separation Agreement defines the term "Facilities:"

The term "Facilities shall mean (i) all of the assets constituting the chemical business conducted at the Ethylene Plant, the Chlor-Alkali Plant and the Utilities at Calvert City, Kentucky, as defined in a Right of First Refusal Agreement dated as of March 1, 1990 between [Goodrich] and [Westlake], (ii) the approximately 58 acres of land located at or near Calvert City, Kentucky and referred to in an Option Agreement between [Goodrich] and Westlake dated March 1, 1990, and (iii) the approximately 125 acres of land owned by Goodrich on the south side of Highway 1523 at or near Calvert City, Kentucky and adjacent to the land referred to in clause (ii) above.

The specific properties owned by Goodrich not included in the Section 17.D definition of "Facilities," and thus to be transferred to Geon, are the Superfund Tract, the Pond and Closure Cell Tract, and the C-Stripper Tract. There is no dispute that these were the properties that were to be transferred.

Goodrich tendered a quit claim deed and easements to transfer the three Environmental Sites to PolyOne on August 1, 1997, but PolyOne did not act to execute the documents. Goodrich subsequently attempted to tender these documents to PolyOne on three other occasions; on January 20, 2000, April 16, 2001, and April 18, 2007. PolyOne has never acted to execute the documents.

Goodrich now asks this Court to order specific performance of the 1993 Separation Agreement and the 1993 Bill of Sale, requiring PolyOne to accept title to the Environmental Sites and complete the transfer of the real property.

**STANDARD**

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

**DISCUSSION**

**I.     APPLICABLE LAW**

As this is a diversity action, the Court applies the substantive law of Kentucky, including its choice of law standards. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003). The 1993 Separation Agreement and the 1993 Bill of Sale contain no choice of law provision. Kentucky applies its own law to contract claims if there are sufficient contacts with Kentucky and there are no overwhelming interests to the contrary. *See Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983). The Court finds that there are sufficient contacts between the parties and Kentucky and therefore will apply Kentucky law in resolving whether Goodrich is entitled to specific performance under the 1993 Bill of Sale.

**II.    SPECIFIC PERFORMANCE**

"[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)). If an ambiguity exists, "the court will gather, if possible, the intent of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions." *Id.* (internal quotation omitted). However, "in the absence of ambiguity a written instrument will be enforced strictly according to its terms." *Id.* (quoting *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)). The Court will "interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.*

With respect to a conveyance of real property, specific performance requiring a party who

is contractually obligated to take title to the property to accept title to the property is an appropriate remedy for the breach. *Davis v. Lacy*, 121 F. Supp. 246, 251-52 (E.D. Ky. 1954) (quoting *Harmon v. Thompson*, 84 S.W. 569, 572 (1905)).

PolyOne contends that between 1993 and 1997, Goodrich knowingly permitted Westlake to continually contaminate the Environmental Sites to the extent that they are no longer in the same condition as when PolyOne originally agreed to accept title to them. PolyOne asserts that this is a material breach of the contract by Goodrich and undermines any claim for specific performance.

Specific performance is an equitable remedy premised on what is "just and fair in all respects." *Woollums v. Horsley*, 20 S.W. 781, 781 (Ky. 1892). Specific performance of a contract concerning property will not be ordered where conditions have so changed as to render enforcement of the contract unconscionable. *See Neely v. Consol, Inc.*, 25 Fed. Appx. 394, 402 n.4 (6th Cir. 2002) (citing *Bean v. Brown*, 259 S.W. 47, 49 (Ky. 1924); *Wollums v. Horsley*, 20 S.W.781, 781 (Ky. 1892)). "Unconscionable" conduct has been defined as conduct that is excessive, unreasonable, shockingly unfair, or unjust. *In re Emnett*, 127 B.R. 588, 602 (Bankr. E.D. Ky. 1991). Unconscionability determinations are fact specific and are addressed on a case-by-case basis. *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 342 (Ky. Ct. App. 2001).

Goodrich asserts that PolyOne intended to delay the real property transfer. This Court construes Goodrich's argument as stating that because PolyOne was the party who delayed the transfer, it cannot argue changed conditions at this time. Goodrich also argues that PolyOne cannot argue that the nature of the property has changed when PolyOne knew that the changes to the property were already occurring, i.e., that Westlake was contaminating the Site.

Although PolyOne may have sought to delay the real property transfer, that does not prevent

the Court from finding that the current conditions are so changed as to render the contract unconscionable.[2] Nor did the fact that PolyOne asked Goodrich to delay the transfer until 1999 prevent Goodrich from tendering the quit claim deed and easements prior to that time, as demonstrated by the 1997 tender. Additionally, the Court finds that Goodrich has failed to provide undisputed evidence that PolyOne knew of the extent of Westlake's contamination and the extent of Westlake's future contamination at the time that it entered the 1993 Bill of Sale.

Thus, this Court finds that there are factual disputes concerning the issue of whether the condition of the property has so changed from the time of the 1993 Bill of Sale until the time of tender so as to render specific performance unconscionable. Therefore, this Court finds that summary judgment on Goodrich's claim for specific performance is inappropriate at this time.[3]

---

[2] On March 12, 1993, PolyOne's Environmental Director addressed a memo to PolyOne's President, copying the memo to PolyOne's attorneys, concerning the real property transfer. The memo states, in pertinent part:

> [Goodrich's President] has directed (memo to you of 3/8/93) that certain Calvert City land would be transferred to [PolyOne]. This would include the RCRA closure cell.
>
> Transfer of the ownership of the RCRA closure cell land to [PolyOne] will require that the State and USEPA amend the [Goodrich] RCRA permit. This amendment could have a major financial impact on [PolyOne].
>
> . . .
>
> We recommend that the land beneath the RCRA closure cell not be transferred from [Goodrich[ to [PolyOne] until 1999 when the RCRA permit expires and has to be renewed anyway. . .
>
> This is a critical issue of extreme importance to [PolyOne].

[3] Having found summary judgment inappropriate due to the existence of genuine issues of material fact concerning changed conditions; this Court will abstain from addressing PolyOne's other arguments as to why summary judgment on this claim is inappropriate.

## CONCLUSION

For the foregoing reasons, Goodrich's Motion for Partial Summary Judgment on its Specific Performance Claim is DENIED.

An appropriate order shall issue.