UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                                    PLAINTIFF

v.

GOODRICH CORPORATION                                              DEFENDANT;
                                                          THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                           THIRD PARTY DEFENDANT


## MEMORANDUM OPINION

This matter is before the Court on Goodrich Corporation's Motion for Partial Summary Judgment on Counts I and II of PolyOne Corporation's Counterclaim (Docket #458). PolyOne filed a response (Dockets #495, 497), to which Goodrich has replied (Docket #527). This matter is now ripe for adjudication. For the reasons that follow, Goodrich's Motion for Partial Summary Judgment on Counts I and II of PolyOne's Counterclaim is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Many of the pertinent facts regarding the history of the Calvert City Site (the "Site") and the applicable contracts are set forth at length in the Court's Memorandum Opinion on Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims; only relevant facts not discussed in that Memorandum Opinion will be described here.

On March 1, 1990, pursuant to the Amended and Restated Master Conveyance Agreement ("1990 Agreement"), Goodrich sold the EDC/VCM Plant to Westlake Vinyls, Inc. In Section 8.3 of the 1990 Agreement, Westlake agreed to "indemnify and save Goodrich harmless from and

against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date."  Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2.

As part of the 1990 Agreement to sell the EDC/VCM Plant, Westlake and Goodrich met with state and federal environmental regulators before the closing to discuss the status of the Permit. Goodrich advocated to the regulators that Westlake not be added to the Permit.  Ultimately, the state did not require Westlake to become a permittee; provisions allowing Goodrich access to Westlake's property to conduct its remediation obligations under the Permit were deemed satisfactory.

Goodrich formally notified environmental regulators that certain of Westlake's underground sewers were leaking in January and February 1991.  Goodrich advised Kentucky regulators in November 1991, that "all the SWMU's . . . on Westlake's property should be permitted to [Westlake] and not [Goodrich]".  Goodrich's reports of Westlake's leaking sewers did not cause regulators to require Westlake to become a Part B permittee.  Westlake denied that its operations, including sewers, caused any groundwater contamination at the Site.

On February 11, 1993, Goodrich began to divest itself of its PVC business, incorporating a new, wholly-owned subsidiary, Geon.  Effective March 1, 1993, Goodrich transferred substantially all of the liabilities and assets of its PVC business that had been operated by the Geon Vinyls Division to the newly-formed Geon in an Amended and Restated Separation Agreement ("Separation Agreement") and in an Amended and Restated General Assignment and Bill of Sale Relating to the Goodrich PVC Business ("1993 Bill of Sale").  Goodrich sold all of its shares in a

2

two-stage public offering that took place in May and November of 1993.

Goodrich originally intended to transfer all of its PVC-related assets at Calvert City to Geon in the divestiture, including the CA&O Plant and utilities. However, Westlake filed legal proceedings against Goodrich, claiming that the transfer of assets and impending IPO triggered the right of first refusal to purchase the CA&O Plant and utilities from Goodrich under the 1990 Agreement. As a result of Westlake's actions, the utilities and CA&O Plant were pulled back from the transaction at the last moment. Hence, Goodrich did not transfer ownership of the CA&O Plant assets and certain utilities at the Site in connection with the 1993 Bill of Sale and 1993 Separation Agreement, but did transfer all of its liabilities associated with the Calvert City Site, including all environmental liabilities and all existing and future obligations under the Permit and PCAP.

Geon's agreement to assume Goodrich's Calvert City obligations and to indemnify Goodrich for such obligations is set out in the 1993 Amended and Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA"). Generally, Geon assumed all of Goodrich's obligations and liabilities relating to the Goodrich PVC Business, which was defined to include all of Goodrich's Calvert City environmental liabilities and obligations associated with the EDC/VCM Plant, the CA&O Plant, the RCRA Permit and other permits, the PCAP, and the Calvert City Environmental Sites, and all of Goodrich's liabilities to Westlake arising out of the operation of the assets transferred to Westlake under the 1990 Agreement. The 1993 ALIA provided PolyOne[1], as Geon's successor, with the right to prosecute in Goodrich's name, any claims Goodrich may have against third parties for contractual indemnity:

---

[1] Geon merged with M.A. Hanna Company in September 2000 to form PolyOne. PolyOne and Geon will be used interchangeably for purposes of this motion.

3

PROVIDED FURTHER THAT Goodrich shall make available to [PolyOne] to the extent it can (but without the obligation for Goodrich to incur any costs or assume any liabilities) the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by [PolyOne] hereby.

Geon also contracted with Goodrich for certain services and utilities to support its remediation responsibilities at the Site. These are reflected in the 1993 PSA between Goodrich and Geon, effective April 28, 1993. In the 1993 PSA, the parties agreed to provide each other the services set forth in the separate environmental services agreements attached as exhibits. Exhibit 3.3, entitled "Environmental Services Agreement Calvert City" ("1993 ESA"), to the 1993 PSA describes the applicable services to be provided with respect to the RCRA Permit and other remediation activities. Section II.B of the 1993 ESA states:

Geon shall have a person assigned to the facility who is responsible for the direction and control of all activities conducted in connection with Geon's ownership and operation of environmental equipment and other activities for which Geon is responsible at Calvert City, including but not limited to:

1.    The RCRA and HSWA post-closure permits, including but not limited to the closed disposal area across Highway 1523, the closed wastewater ponds, and the aquifer stripper (including all groundwater withdrawal wells and header systems)

2.    The Superfund site

3.    Any other environmental issues arising on Geon's property or under the [1993 ALIA].

This position was assigned to Christian Orsborn. In Section II.C of the 1993 ESA, Goodrich agreed to provide utilities and labor at cost to Geon to the extent available at the Site for C-Stripper operation:

To the extent that [Goodrich] has utilities and properly-trained manpower available at the Plant Site, [Goodrich] will make available to Geon at Geon's expense the following services:

4

1.    Utilities necessary to maintain and operate the equipment and activities described in II.B above, to the extent there is capacity to provide same.

2.    Manpower as requested by Geon to maintain and operate the equipment and activities described in II.B above.  Geon shall be responsible for determining what kind of training is appropriate to be give to "properly-trained" workers, and Geon shall reimburse [Goodrich] for the cost of delivering such training.

"Utility" is defined in section 1.1.25 of the 1993 PSA to mean "steam, cooling towers, city water, well water, water treatment, wastewater treatment, fire water, fire alarm, electricity, factory air, plant air, instrument air and/or inert gas Services."  Cost was "[t]o be determined by the financial people."

Goodrich provided a proposed manner of determining these costs.  C-Stripper used 30-pound steam to convert contaminants in groundwater extracted by pumping wells to vapor for removal and re-use or incineration.  This 30-pound steam was let down at a let down station from 180-pound steam manufactured by the boiler house and other byproduct steam generated by exothermic plant processes.  Goodrich charged Geon for C-Stripper's allocated share of the cost of 180-pound steam manufactured in the boiler house.  C-Stripper's allocated share of 180-pound boiler house steam cost was determined by multiplying total steam cost by the ratio of C-Stripper's steam usage in pounds divided by the total steam usage at the entire facility.  Geon understood that Goodrich was determining Geon's steam cost by an allocation of manufactured 180-pound steam cost and that Goodrich was not charging Geon for steam based upon an estimated cost of producing 30-pound steam.

In a July 8, 1993 memo, Orsborn, who signed all invoices on behalf of Geon for charges at the Site, indicated that "the produced steam pricing is reasonable."  Geon, through Orsborn, reviewed, approved, and paid monthly cost statements for C-Stripper from 1993 forward.

Effective August 15, 1997, Goodrich sold its utilities unit, as part of the CA&O transaction

5

to Westlake as documented in the Purchase and Sale Agreement ("1997 PSA").  When Goodrich sold the CA&O Plant and utilities to Westlake, the Goodrich C-Stripper employees became Westlake employees.  Goodrich retained its duty under the Permit and PCAP to operate C-Stripper. In section 4.28.4 of the Manufacturing and Support Services Agreement ("1997 Westlake MSSA"), Goodrich agreed to reimburse Westlake for Westlake's costs of providing C-Stripper services on the same basis as Geon had previously reimbursed Goodrich.

PolyOne was aware that Goodrich received a statement for C-Stripper services each month under the 1997 Westlake MSSA, paid that invoice, and then passed on the full cost to PolyOne in a separate invoice package that included Westlake's invoice and a Goodrich routing sheet approving payment to Westlake and billing of the same amount to PolyOne.  PolyOne reviewed and paid these Goodrich invoices in full (with temporary one and ten percent hold-backs in late 1999 through 2000, that were later made good) through the invoice for the month ending April 30, 2002.

Pursuant to the 1997 Environmental Services Agreement ("1997 Westlake ESA"), Westlake agreed to provide assistance to Goodrich so that Goodrich could comply with Permit obligations and agreed to grant access as necessary to conduct Permit activities on Westlake's property.  Goodrich agreed to advocate that Westlake did not need to become a permittee.  On July 29, 1997, the Cabinet determined that Westlake would not have to become a permittee as a result of the 1997 transactions.

On August 30, 2002, PolyOne notified Goodrich that it was suspending further payments for remediation activities at the Site, other than such obligations that were incurred and actually paid by Goodrich prior to June 1, 2002.  PolyOne's actions were based on the receipt of a summary report from Environmental Resources Management ("ERM") dated April 25, 2002, which stated that "as much as 85 percent of the EDC being recovered today is a result of EDC releases that have occurred

6

after 1990 time frames." In May of 2002, PolyOne requested that Goodrich not pay any pending or future Westlake invoices until the issues had been resolved. PolyOne decided in 2006 that Westlake's share of C-Stripper costs was at least fifty percent, therefore, PolyOne resumed payment of fifty percent of Goodrich's C-Stripper costs. PolyOne did not pay any of the past-due invoices from May 2002 through December 2005.

When PolyOne provided Goodrich with a copy of the ERM summary report, Goodrich asked PolyOne to provide the full report and the data supporting ERM's assertion. The data was offered to Goodrich on the basis of cost sharing for the report, however, Goodrich was not willing to pay the amount asked; therefore, PolyOne refused to provide the data.

In October of 2002, Westlake released over two million pounds of EDC at the Site. Following an investigation, Goodrich advised Westlake that Goodrich would pay Westlake only the percentage of C-Stripper costs that reflected Goodrich's share based upon the contamination attributable to Goodrich operations.

Westlake filed the instant action on October 16, 2003, seeking to recover the portion of C-Stripper costs Goodrich claimed were attributable to Westlake's releases. Goodrich notified PolyOne in writing of Westlake's claims on October 21, 2003. On October 30, 2003, Goodrich, by letter, tendered the defense of the suit to PolyOne. Goodrich also reminded PolyOne that it had the right to prosecute Goodrich's 1990 Agreement and 1997 PSA indemnity claims against Westlake at its own expense under the 1993 ALIA. On November 17, 2003, PolyOne declined Goodrich's tender of the defense for the action. Goodrich directed counsel to conduct its own defense against Westlake's claims, filed a counterclaim against Westlake for indemnity and allocation of responsibility for certain remediation costs under the 1990 Agreement and the 1997 PSA and filed

7

a third party complaint against PolyOne.

On March 29, 2005, the Court granted Westlake's motion for summary judgment against Goodrich on Westlake's claim.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards

of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

### I.    APPLICABLE LAW

As this is a diversity action, the Court applies the substantive law of Kentucky, including its choice of law standards. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003). The 1993 ALIA provides that it is to be governed by Ohio law. Likewise, the 1993 PSA provides that it is to be governed by Ohio law. The Sixth Circuit recognizes that Kentucky will enforce contractual choice of law provisions "unless 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.'" *Bank of N.Y. v. Janowick*, 470 F.3d 264, 271 n.3 (6th Cir. 2006) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a) (1999)). At the time of the divestiture, both Goodrich and Geon were headquartered in Ohio. Thus, the Court finds that the choice of Ohio law is reasonable and therefore will apply Ohio law to determine the obligations of the parties under the 1993 Agreements.

### II.    COUNT I

In Count I of its Counterclaim, PolyOne alleges that Goodrich breached the 1993 PSA by overcharging PolyOne for utility services. PolyOne asserts that Goodrich presented inflated invoices for C-Stripper services, committing a fraudulent misrepresentation.

To establish a breach of contract, PolyOne must show that a contract existed and its performance thereon, breach by Goodrich, and damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (applying Ohio law). In *McClorey v. Hamilton County Board of Elections*,

9

an Ohio appellate court summarized principles of contract interpretation that have been articulated

by the Supreme Court of Ohio:

> In the construction of a written contract, it will be read as a whole, and the intent of
> each part will be gathered from a consideration of the whole.  The language and
> terms of the contract are to be given their plain, common, and ordinary meanings.
> But if the language is ambiguous, then a court must construe the language against the
> party who prepared the contract.  Language is ambiguous if it is reasonably
> susceptible of two or more constructions.

720 N.E.2d 954, 956-57 (Ohio Ct. App. 1998) (quoted in *Mead Corp. v. ABB Power Generation,*

*Inc.*, 319 F.3d 790, 797 (6th Cir. 2003)).

## A.    Applicability of Agreements

Goodrich argues that following the 1997 sale of the CA&O Plant to Westlake, the 1993 PSA

did not apply to the cost of C-Stripper services.  Under the 1993 PSA, Goodrich was required to

make available to PolyOne the utilities necessary to maintain and operate the C-Stripper to the

extent that Goodrich had the utilities and properly-trained manpower available at the Site.  "Utility"

is defined in section 1.1.25 of the PSA to include steam.  Thus Goodrich was only required to

provide steam pursuant to the 1993 PSA if it had utilities and manpower at the Site.  Following the

1997 sale of the CA&O Plant and utilities to Westlake, the Goodrich C-Stripper employees became

Westlake employees.  Thus, following the 1997 CA&O Plant sale, Goodrich no longer had utilities

or manpower at the Site and, therefore, was no longer required to provide steam pursuant to the 1993

PSA.  Hence, the provision of steam to PolyOne following the 1997 sale of the CA&O Plant is not

governed by the 1993 PSA.  Prior to the 1997 CA&O Plant sale, the obligations between Goodrich

and PolyOne with respect to C-Stripper were governed by the 1993 PSA.

Following the 1997 CA&O Plant sale, Goodrich was still required pursuant to the Permit and

PCAP to operate C-Stripper.  Under the 1993 ALIA, PolyOne remained obligated to pay for

10

remediation costs associated with the Permit, including the costs of C-Stripper.  Thus, following the 1997 CA&O Plant sale, the obligations between Goodrich and PolyOne with respect to C-Stripper are governed by the 1993 ALIA.

**B.     1993 PSA**

The 1993 PSA governs the obligations between Goodrich and PolyOne with respect to C-Stripper prior to the 1997 sale of the CA&O Plant.  PolyOne argues that the 1993 PSA is ambiguous, and therefore its interpretation is a question for the jury.

"Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation." *Lewis v. Mathes*, 829 N.E.2d 318, 323-24 (Ohio Ct. App. 2005).  Where there is an ambiguity, the interpretation of the parties' intent is a question of fact.  *Id.* at 324.  PolyOne argues that the 1993 PSA is ambiguous as it contained no definition of cost, instead stating that cost was "[t]o be determined by the financial people."

Where a services contract contains an open price term, the agreement is not necessarily ambiguous.  *Malaco Constr. v. Jones*, No. 94APE10-1466, 1995 Ohio App. LEXIS 3534, at *17 (Ohio Ct. App. Aug. 24, 1995).  Ohio courts recognize that an agreement to agree is enforceable "when the parties to a contract clearly manifest an intention to be bound.  *Id.*  "If it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result."  *Id.* (quoting *Litsinger Sign Co. v. Am. Sign Co.*, 227 N.E.2d 609, 619 (Ohio 1967)).  In *Oglebay Norton Co. v. Armco*, the Ohio Supreme Court set forth a two-step procedure to employ when addressing the enforceability and conditions of a services contract with a significant open term.  556 N.E.2d 515 (Ohio 1990).

11

First, the trial court must establish whether the parties intended to be bound by the terms of the contract despite the failure to reach accommodation on price. *Id.* at 519-20. Secondly, the open price term must be filled with a "reasonable price" pursuant to the usage of trade or by the course of dealing between the parties. *Id.*

It is clear that the parties intended to be bound by the 1993 PSA having performed according to the agreement for many years despite the open price term. Thus, this Court must determine it if can fill the open price term with a "reasonable price" pursuant to trade usage or the course of dealing between the parties.

In a letter from Steven Guidry, vice president and general manager of the CA&O Plant, to C.J. Nosal, a Geon employee, on June 29, 1993, Guidry indicated that Goodrich planned to charge Geon for monthly steam usage using the actual boiler house costs divided by the total steam generated multiplied by the measured usage in pounds. The actual boiler house costs included direct labor, indirect labor, maintenance, fuel, water, electricity, chemical, and miscellaneous overhead consisting, in part, of outside testing, professional services, small tools, and waste disposal. While Geon initially questioned Goodrich's method and proposed alternative methods of determining steam cost, PolyOne's issues with Goodrich's method of determining costs were resolved by agreeing to an annual steam venting credit of $10,000, which was documented in writing in 1995. Geon, through Orsborn, reviewed, approved, and paid monthly cost statements and invoices for C-Stripper on this basis from 1993 forward.

Geon's approval of the invoices which were calculated pursuant to the method suggested by Goodrich, establishes a course of dealing between the parties. This method was reasonable as evidenced by Orsborn's reporting to Geon management that "the produced steam pricing is

reasonable." Therefore, the Court finds that the parties agreed to a price term of monthly steam usage using the actual boiler house costs divided by the total steam generated multiplied by the measured usage in pounds with an annual steam venting credit of $10,000.

Thus, Goodrich did not violate the 1993 PSA by employing this method of calculating the price of steam.

## C.     1993 ALIA

Following the 1997 CA&O Plant sale, the obligations between Goodrich and PolyOne with respect to C-Stripper are governed by the 1993 ALIA. In the 1997 MSSA, Goodrich agreed to reimburse Westlake for Westlake's costs of providing C-Stripper services on the same basis as PolyOne had previously reimbursed Goodrich. Goodrich then passed this cost on to PolyOne.

Pursuant to the 1993 ALIA, PolyOne was required to reimburse Goodrich for these costs. It is clear that Goodrich passed on the same cost to PolyOne with respect to C-Stripper that it was charged by Westlake. Requiring PolyOne to reimburse it for this remediation cost, was a right Goodrich retained under the 1993 ALIA.

PolyOne alleges that Goodrich owed PolyOne a fiduciary duty to negotiate a lower price for the steam rate when it sold the CA&O Plant and utilities to Westlake in 1997, a price at least as low as it negotiated for its Carbopol Plant. Goodrich asserts that it owed no fiduciary duty to PolyOne. Goodrich also argues that it did not make any sense for Goodrich to unilaterally seek to disturb the status quo regarding steam cost in 1997 as PolyOne had already assented to the method and agreed that it was reasonable.

The Carbopol Plant, as well as the DCPD Plant, are speciality chemical plants formerly owned and operated by Goodrich, which occupy a small portion of the Site. In connection with the

13

1997 sale, Goodrich and Westlake negotiated separate steam agreements for each of these two plants.  The agreements are tailored to each operation and their steam needs.  Under these agreements, steam is provided at a lower cost than that charged for steam for C-Stripper, as there is no obligation to pay a Steam Based Controllable Cost Fee, comprising a surcharge for labor, maintenance, electricity, water, miscellaneous chemicals, miscellaneous charges, and fixed costs.

A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom.  *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988).

> A fiduciary relationship creates the highest order of duty imposed by law.  If a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal . . .  In a fiduciary relationship, the fiduciary must make every effort to avoid having his own interests conflict with those of the principal . . . When conflict is unavoidable the fiduciary must place the interests of the principal above his own.

*In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002).

"A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing."  *Id.*  This distinction was described by the Texas Supreme Court in *Crim Truck & Tractor Co. v. Navistart International Transportation Corp.*:

> The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.
> . . .
> The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship.  Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract.  Neither is the fact that the  relationship has been a cordial one, of long duration, evidence of a confidential relationship.

823 S.W.2d 591, 594-95 (Tex. 1992), *quoted in In re Sallee*, 286 F.3d at 891.

14

The Ohio Supreme court has recognized that a fiduciary relationship may be created out of an informal relationship, where both parties understand that a special trust or confidence has been reposed. *Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320, 323 (Ohio 1979), *cited in Ohio Bureau Workers' Comp. v. MDL Active Duration Fund, LTD*, 476 F. Supp. 2d 809, 822 (S.D. Ohio 2007). "A de facto fiduciary relationship may arise from a confidential relationship, in which 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal." *Ohio Bureau Worker's Comp.*, 476 F. Supp. 2d at 822 (quoting *Indermill v. United Sav.*, 451 N.E.2d 538, 541 (1982)). A de facto fiduciary relationship may originate from one party's superior conversance in the subject matter of the transaction. *Prudential Ins. Co. v. Eslick*, 586 F. Supp. 763, 766 (S.D. Ohio 1984).

However, a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust of confidence has been reposed. *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1331-32 (Ohio Ct. App. 1993). Such a confidential relationship cannot be unilateral, *id.*; the parties must agree that one is acting in the best interest of the other, *In re Sallee*, 286 F.3d at 893.

PolyOne argues that it "had no choice but to rely upon Goodrich in . . . limiting PolyOne's liability to that which it assumed under its Agreement with Goodrich. And Goodrich knew from 1993 on that PolyOne had no alternative but to rely upon Goodrich."[2] PolyOne has established that there are factual disputes regarding its and Goodrich's understanding as to whether Goodrich was acting in PolyOne's best interests. Such a factual dispute precludes this Court from determining

---

[2] The quoted statement is from PolyOne's reply brief in support of its Motion for Summary Judgment (Docket #530).

15

whether there was a de facto fiduciary relationship.  *See Prudential*, 586 F. Supp. at 766 (stating that the existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of each case).

Goodrich argues that even if there was a fiduciary duty, Goodrich did not breach such a duty by failing to reduce the cost PolyOne agreed to pay for C-Stripper in 1993.  However, the fiduciary duty with respect to C-Stripper, if any, only applies to actions over which PolyOne is dependent on Goodrich to assert its interests with regard to Westlake.  Thus, any fiduciary duty with respect to steam costs for C-Stripper would not have arisen until the sale of the CA&O Plant to Westlake in 1997.  At that point, PolyOne was dependent on Goodrich to negotiate with Westlake to limit PolyOne's liability under the 1993 ALIA.  If a fiduciary duty did exist, it would have required Goodrich to put PolyOne's interests before its own upon negotiating the terms of steam prices following the 1997 sale of the CA&O Plant, but not prior to that time.  Therefore, the fact that PolyOne was charged on the same basis before and after the 1997 CA&O Plant sale does not preclude this Court from finding that if a fiduciary duty existed it was breached.  It is unclear whether Goodrich could have negotiated a lower price for steam for C-Stripper.

The Court finds that material questions of fact exist as to a breach of fiduciary duty by Goodrich.  Such a finding precludes summary judgment on Count I of PolyOne's Counterclaim.

**D.    Fraud**

PolyOne alleges that Goodrich fraudulently billed PolyOne for steam costs that were more than the cost of the services.  Goodrich asserts that PolyOne cannot recover under a fraud theory under the economic loss doctrine.

While Ohio law governs PolyOne's contract claims due to the choice of law provision,

PolyOne's claim for common law fraud is governed by Kentucky law; Kentucky has significant contacts to the parties and issues at stake as the C-Stripper operation is in Kentucky.  *See Adam v. J.B. Hunt Transp.*, 130 F.3d 219, 230-31 (6th Cir. 1997).

In Kentucky, a plaintiff claiming fraud must establish six elements by clear and convincing evidence: (1) a material misrepresentation; (2) which is false; (3) which is known to be false or is made recklessly; (4) made with the intent that it be acted upon; (5) actual reliance thereon; and (6) which causes injury.  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

The economic loss doctrine precludes a plaintiff from recovering under a fraud theory when that claim is intertwined with a breach of contract claim.  *See Highland Stud Int'l v. Baffert*, No. 00-261-JMH, 2002 U.S. Dist. LEXIS 27987, at *17-18 (E.D. Ky. May 16, 2002); *Purizer Corp. v. Battelle Mem'l Inst.*, No. 01 C 6360, 2002 U.S. Dist. LEXIS 138, at *4 (N.D. Ill. Jan. 4, 2002).  PolyOne does not dispute that its fraud claim mirrors the underlying breach of contract claim, rather PolyOne argues that the economic loss doctrine does not apply in the instant case as the contract was not for a sale of a good.

> The economic loss rule bars recovery in tort for economic loss.  Economic loss is both loss in the value of a product caused by a defect in that product (direct economic loss) and consequential loss flowing from the defect, such as lost profits (consequential economic loss.) . . . The economic loss rule marks the border between tort and contract law.  Where tort law, primarily out of a concern for safety, fixes the responsibility for a defective product directly on the parties responsible for placing the product into the stream of commerce, contract law gives the parties to a venture the freedom to allocate risk as they see fit.  Were there no economic loss rule, contract law might drown in a sea of tort.

*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002) (internal quotation omitted).  Although Kentucky courts have yet to specifically adopt the economic loss doctrine, the Sixth Circuit has held that Kentucky would follow the economic loss rule in at

17

least some circumstances. *Id.* at 849 (holding that Kentucky would apply economic loss rule to preclude tort recovery for economic losses stemming from business purchases).

In *Highland Stud International v. Baffert*, the District Court for the Eastern District of Kentucky considered the application of the economic loss doctrine to a contract for a horse's breeding rights. Plaintiff's complaint asserted five claims: fraud, negligent misrepresentation, malpractice, recission, and breach of contract. *Highland Stud*, 2002 U.S. Dist. LEXIS 27987 at *5. Plaintiff argued that the economic loss doctrine did not apply based on the ground that the underlying transaction involved the purchase not of a "good" per se, but only certain rights to that "good," i.e. breeding rights. *Id.* at *12 n.4. The Court found this argument unpersuasive, stating, "the economic loss rule applies to bar torts claims arising not only from purchases of goods themselves, but any transaction that may be characterized a 'business purchase' . . . the economic loss rule bars tort claims seeking recovery not only for damage to products themselves but also for consequential economic loss." *Id.* (quoting *Hoover Universal*, 276 F.3d at 849). The court applied Kentucky law to dismiss the plaintiff's tort claims under the economic loss doctrine. *Id.* at *16.

Like the plaintiff in *Highland Stud*, PolyOne argues that the economic loss doctrine does not apply to its claim of fraud, as the contract was not for the sale of a good. This Court finds the reasoning of the Eastern District of Kentucky sound, and finds that the economic loss doctrine would apply to PolyOne's fraud claim, as it is a tort claim arising from a business purchase which is intertwined with the underlying contract action.

Therefore, this Court finds that PolyOne's claim of fraud is precluded by the economic loss doctrine.

III.   **COUNT II**

18

In Count II of its Counterclaim, PolyOne alleges that Goodrich breached the 1993 ALIA when it refused to enforce its indemnification rights against Westlake.[3] PolyOne argues that Goodrich was the only party in privity with Westlake and, consequently, the only party that could force Westlake to honor its remediation responsibilities. Goodrich argues that PolyOne cannot identify any provision of the 1993 ALIA that such action, if true, would violate. Goodrich asserts that PolyOne has been empowered since the execution of the 1993 ALIA to file suit against Westlake in Goodrich's name to secure the benefit of Westlake's indemnification of Goodrich under the 1990 Agreement and, from 1997 forward, Westlake's indemnification under the 1997 PSA.

Here PolyOne retained the right to assert in Goodrich's name any assumption of liability or indemnification provision in any agreement with a third party with respect to any liabilities assumed by PolyOne. Thus PolyOne was not prevented from asserting an action in Goodrich's name for any violation by Westlake of the indemnification provisions in the 1990 Agreement or 1997 PSA. *See Travelers Indem. Co. v. Brooks*, 395 N.E.2d 494, 495 (Ohio Ct. App. 1977); *see also Fed. Sav. & Loan Ins. Corp. v. Reeves*, 816 F.2d 130, 133-34 (4th Cir. 1987). PolyOne has failed to assert a claim of breach of the 1993 ALIA.

## CONCLUSION

For the foregoing reasons, Goodrich's Motion for Partial Summary Judgment on Counts I

---

[3] PolyOne also asserts that Goodrich breached the 1993 ALIA when it entered into the side letter agreement with Westlake. This Court has previously determined in Goodrich's Motion for Summary Judgement on its Declaratory Claims that Goodrich did not breach the 1993 ALIA when it entered into the side letter agreement with Westlake. This Court found that under the 1993 ALIA PolyOne was required to pay remediation costs for contamination at the Site regardless of source, and therefore, any increased difficulty of distinguishing the source of such contamination caused by the side letter was of no consequence to PolyOne's indemnification obligations.

and II of PolyOne's Counterclaim is GRANTED IN PART and DENIED IN PART.  Goodrich is granted summary judgment as to Count II of PolyOne's Counterclaim.  PolyOne may proceed on Count I of its Counterclaim with respect to C-Stripper costs occurring after Goodrich's sale of the CA&O Plant to Westlake in 1997.

An appropriate order shall issue.