UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:03CV-240-R

WESTLAKE VINYLS, INC.                                                PLAINTIFF

v.

GOODRICH CORPORATION                                            DEFENDANT;
                                                      THIRD PARTY PLAINTIFF

v.

POLYONE CORPORATION                            THIRD PARTY DEFENDANT


**MEMORANDUM OPINION**

This matter is before the Court on Westlake Vinyls, Inc.'s Motion in Limine to Exclude Certain Evidence of Damages at Trial (Docket #593).[1]  Goodrich Corporation filed a response (Docket #634).  This matter is now ripe for adjudication.  For the reasons that follow Westlake's Motion in Limine is DENIED.

**BACKGROUND**

During the 1950s, an industrial park was developed on the southern bank of the Tennessee River near Calvert City, Kentucky.  Goodrich purchased approximately 150 acres of that park in 1951 for use as a manufacturing facility ("the Site").  Goodrich produced vinyl chloride monomer ("VCM") at the Site from 1953 to March 1, 1990.  Goodrich began to use ethylene dichloride ("EDC"), a feedstock used to produce VCM, to make VCM in 1959 and in 1964 it added a new plant to convert EDC to VCM.  The units that "cracked" EDC to form VCM were known collectively as

---

[1]  Pursuant to this Court's Order on October 1, 2007, and upon the request of Westlake, Part A of this Motion has been withdrawn.

the EDC/VCM Plant.  Goodrich also built and operated facilities at the Site that manufactured ethylene and chlorine, the feedstock for EDC, and a byproduct called caustic.  This part of the Site was known as the Chlor-Alkali and Olefins Plant ("CA&O Plant").

Waste containing EDC was generated at the Site.  Treatment included settlement ponds, landfills, and burn pits.  Over a period of time, some of the EDC contained in this waste migrated through the soil to the groundwater underlying the Site.

In June of 1988, the Environmental Protection Agency ("EPA") issued a Record of Decision declaring a portion of the Site, specifically a landfill on the Site's eastern boundary, a "Superfund Site" subject to remediation requirements under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  Goodrich was required to secure approval of, implement, complete, and pay for remedial actions approved by the EPA and to provide reimbursement for future oversight costs.

The Kentucky Natural Resources and Environmental Protection Cabinet (the "Cabinet") issued a Hazardous Waste Management Permit to Goodrich effective October 29, 1989.  The EPA issued a similar permit under the Hazardous Solid Waste Management Act Amendments ("HWSA") Post-Closure Permit, also effective October 29, 1989.  Together the Kentucky and EPA permits form the Resource Conservation and Recovery Act ("RCRA") Part B Permit for the Site.[2]

As the sole permittee, Goodrich must comply or ensure compliance with all terms and

---

[2]  RCRA mandates that "each person owning or operating an existing facility . . .  for the treatment, storage, or disposal of hazardous waste . . . have a permit.  42 U.S.C. § 6925(a).

The two permits that collectively constituted the RCRA Part B Permit were replaced by one Hazardous Waste Management Permit effective October 30, 2003.  Portions pertinent to the instant matter are essentially the same as corresponding portions of the Permit issued in 1989.  Those permits are collectively referred to as the "Permit."

conditions of the Permit.  These legal obligations include:

> To install and maintain a groundwater monitoring system.

> To treat all contaminated groundwater under the Site and to treat all contaminated groundwater migrating outside the Site's boundaries to underlying contiguous properties.

> To develop and implement a corrective action program to clean up the groundwater to a concentration standard established by law and regulation.  The program is known as the Plant-wide Corrective Action Program ("PCAP").  Goodrich's C-Stripper and extraction well system was approved by the regulators as the mandated corrective measure under the PCAP.

> To ensure the PCAP complies with the groundwater protection standard.

> To both operate and adequately fund the PCAP, specifically including the C-Stripper.

> To clean up the groundwater until a demonstration is made that concentrations of targeted contaminants fall below the groundwater protection standard.

Non-compliance with any Permit condition would subject Goodrich to an enforcement action.

On March 1, 1990, pursuant to the Amended and Restated Master Conveyance Agreement ("1990 Agreement"), Goodrich sold the EDC/VCM Plant to Westlake.  In Section 8.3 of the 1990 Agreement, Westlake agreed to "indemnify and save Goodrich harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date."[3]  Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2.  Pursuant

---

[3] "Liability" is defined in the 1990 Agreement as "any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense, including, without limitation, reasonable fees and disbursements of counsel incurred by the indemnified party in investigating and defending any such claim with reimbursement on a current basis."

3

to Section 8.4(d), each party is required to provide actual "out-of-pocket" damages to be indemnified under the contract, and neither party is entitled to indemnification for "any loss of profits, consequential, exemplary or punitive damages."

On July 16, 1997, Goodrich sold the CA&O Plant and its utility units, including the boiler house that made steam for use at the Site, as documented in the Purchase and Sale Agreement as amended August 15, 1997 ("1997 PSA").  Goodrich retained ownership of C-Stripper.

In Section 8.3 of the 1997 PSA, Westlake agreed to "indemnify and save [Goodrich] harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA&O Plant by Westlake after the Closing Date."[4]  Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2, "but excluding any condition or event existing, arising, or occurring at, on, over or under the CA&O Plant for which Westlake indemnified [Goodrich] pursuant to Section 8.3(c) of the [1990 Agreement]."  Section 8.4 limits the liability of the parties under Section 8 of the 1997 PSA to actual damages, stating it does "not include incidental, consequential, indirect loss of profits, or punitive or exemplary damages."

## STANDARD

Relevant evidence is that "evidence having any tendency to make the existence of any fact

---

[4]"Liability" is defined in the 1997 PSA as "any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense, including, without limitation, reasonable fees and disbursements of counsel incurred by [the indemnified party] in investigating and defending any such claim with reimbursement on a current basis."

4

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. All relevant evidence is admissible. FED. R. EVID. 402. Although evidence is relevant, it may be excluded if its probative value is substantially outweighed by unfair prejudice. FED. R. EVID. 403. Unfair prejudice "does *not* mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988).

## DISCUSSION

Westlake argues that under the language of the controlling contracts, Goodrich's remediation costs required by the Permit and its related permit administration costs are "attributable to events occurring or any condition existing prior to the Closing Date" and therefore Goodrich is not entitled to seek indemnification of these costs from Westlake. Thus, Westlake argues evidence of these costs should be excluded from trial.

"[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)). If an ambiguity exists, "the court will gather, if possible, the intent of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions." *Id.* (internal quotation omitted). However, "in the absence of ambiguity a written instrument will be enforced strictly according to its terms." *Id.* (quoting *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)). The Court will "interpret the contract's terms by

assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.*

## I.      INCURRED C-STRIPPER COSTS

Westlake asserts that in seeking to have Westlake pay for its alleged proportional share of the costs to operate C-Stripper, Goodrich is attempting to have Westlake subsidize Goodrich's pre-existing Permit obligations which is not permitted under the controlling contracts. Westlake argues that none of the costs of operating C-Stripper actually increase due to any alleged increase in the mass of EDC being removed by the C-Stripper caused by Westlake's operations and that Goodrich would be obligated to operate C-Stripper regardless of whether Westlake contributed additional contamination as the C-Stripper continues to remove EDC groundwater contamination resulting from Goodrich's operations at the Site. Westlake argues that because Goodrich is not entitled to recover C-Stripper and PCAP costs from Westlake, evidence of those costs must be excluded at trial as it would be irrelevant, prejudicial, and confusing to the jury.

In general, parties have complete freedom to enter into a contract; however, that freedom is limited by public policy reasons. *See Bankers Bond Co. v. Buckingham*, 97 S.W.2d 596, 600 (Ky. 1936).

> [P]ublic policy is usually understood to be the principles under which the freedom of contract and private dealing is restricted by law for the good of the community. Thus certain classes of acts are said to be against public policy and the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interest of the state, apart from illegality or immorality.

*Id.* (internal quotation omitted). The Court finds that the state has an interest in protecting the health of its environment and its people from the effects of pollution. *See, e.g.,* KRS § 224.01-400 (2007); KRS § 2.255 (2007); KRS § 15.255 (2007); KRS § 157.900 (2007).

Under Westlake's interpretation of Section 8.3 of the 1990 Agreement and Section 8.3 of the

1997 PSA, Westlake would be absolved from liability for remediation costs at the Site as any contamination caused by Westlake does not increase the costs associated with C-Stripper.  Hence, Westlake could contaminate at will, knowing that it would not bear the burden of the remediation costs.  The Court finds that such a contract would be void as against public policy.

The Court instead reads the indemnity provisions in Section 8.3 of the 1990 Agreement and Section 8.3 of the 1997 PSA as requiring Westlake to indemnify Goodrich for remediation efforts undertaken in response to contamination caused by Westlake following the relative closing dates.  Thus, evidence of the C-Stripper costs incurred by Goodrich is relevant and as the evidence's probative value is not substantially outweighed by unfair prejudice it is admissible.

## II.      PERMIT ADMINISTRATION COSTS

Westlake asserts that because Goodrich's Permit administration costs would have been incurred regardless of Westlake's alleged contamination, Goodrich has no basis to recover Permit administration costs from Westlake.  Westlake argues that evidence of Goodrich's Permit administration costs must be excluded at trial because they are irrelevant, prejudicial, and confusing to the jury.

At this time the Court finds that Westlake has failed to demonstrate that Permit administration costs are inadmissible.  Although Westlake cites certain administration costs in a footnote to its motion, it is unclear whether these are the only costs which Westlake seeks to exclude; thus the Court cannot adequately determine the issue of admissibility at this time.

### CONCLUSION

For the foregoing reasons Westlake's Motion in Limine to Exclude Certain Evidence of Damages at Trial is DENIED.

7

An appropriate order shall issue.